Filed 4/13/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TRAVION WEDDINGTON et al.,<br><br>    Defendants and Appellants. | B256361<br><br>(Los Angeles County<br>Super. Ct. No. PA071550) |

APPEALS from judgments of the Superior Court of Los Angeles County, Harvey Giss, Judge.  Affirmed with directions.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant Travion Weddington.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant Willie Nunnery.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant Taliah Bashir.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

_____

Travion Weddington, Willie Nunnery, and Taliah Bashir appeal from the judgments entered following a jury trial in which they were convicted of one count of first degree burglary in violation of Penal Code section 459,[1] one count of conspiracy to commit residential burglary (§ 182, subd. (a)(1)), four counts of attempted first degree burglary (§§ 664, 459), one felony count of evading a peace officer in willful disregard for safety (Veh. Code, § 2800.2, subd. (a)), and one count of possession of burglar's tools (§ 466). Following a bifurcated bench trial, the trial court found true the gang enhancement allegations as to all three defendants on all counts of conviction. (§ 186.22, subd. (b)(1).) The court sentenced Weddington to an aggregate term of 18 years 8 months in state prison; Nunnery to a total term of 14 years 4 months in state prison;[2] and Bashir to an aggregate term of 15 years in state prison.

Appellants contend:[3] (1) the attempted burglary convictions must be reversed for insufficient evidence because appellants' conduct did not progress beyond planning and preparation; (2) the true finding on the gang enhancement must be reversed for lack of substantial evidence that the underlying offenses were gang-related; (3) the evidence is insufficient to sustain the conviction on count 4 against Nunnery and Weddington for evading a peace officer in willful disregard for safety because they were merely passengers in the vehicle driven by Bashir; (4) the conviction on count 4 must also be reversed based on the trial court's failure to instruct the jury on the lesser included offense of misdemeanor evading a peace officer; and (5) a remand for resentencing for the conviction of possession of burglary tools is required based on the trial court's

---

[1] Undesignated statutory references are to the Penal Code.

[2] Nunnery pleaded guilty to count 5, misdemeanor battery (§ 243, subd. (c)(2)) and received a one-year consecutive sentence. However, the abstract of judgment omits reference to the sentence on count 5, incorrectly reflecting an aggregate term of 13 years 4 months.

[3] Each of the appellants has joined and adopted by reference all arguments raised by co-appellants that may accrue to his or her benefit. (*People v. Stone* (1981) 117 Cal.App.3d 15, 19, fn. 5; Cal. Rules of Court, rule 8.200(a)(5).)

2

misunderstanding of its sentencing discretion. We find no merit to appellants' contentions, and affirm.

## FACTUAL BACKGROUND

### September 7, 2011[4]

Elizabeth Barba and her husband Jose Fernandez lived on the 11000 block of Gerald Avenue in Granada Hills. On September 7, 2011, about 10:30 a.m., Fernandez was walking to his truck on the street when he noticed a red Chrysler Sebring parked nearby. Two African-American males were seated in the vehicle, but the driver's seat was empty. The outside temperature was about 100 degrees that day, and Fernandez thought it suspicious that someone would be sitting in a car in the heat. Fernandez went back inside, and when he came out, the car was gone. About half an hour later, Fernandez saw the Sebring coming down the street. As the car passed, Fernandez could see the driver, who appeared to be an 18- to 25-year-old woman, as well as the same passengers he had seen earlier.

Sometime after Fernandez had left, Barba noticed a red car parked across the street. The car pulled away, but returned five or ten minutes later. Barba saw the driver, whom she later identified as Bashir, get out of the car and approach Barba's front door. When Bashir reached the front door she pounded on it loudly for about 30 seconds. Barba became frightened. She gathered her children and went to the master bedroom as the pounding continued. When the pounding stopped, Barba saw Bashir return to the red car, where two male passengers were waiting. The car then drove away.

About 11:00 a.m. that day, as Los Angeles Police Officer John Parker was on patrol near Havenhurst Avenue in Granada Hills, he noticed a red Chrysler Sebring driven by a woman with two male passengers who were slouching down in their seats. Officer Parker followed the vehicle and next saw it stopped in the alley behind Barba's house. Weddington got out of the car, and as he walked toward the trunk of the Sebring,

---

[4] Because the jury acquitted appellants on count 13, we omit a recitation of the evidence related to that count.

he looked in Officer Parker's direction and immediately got back into the car. The Sebring then accelerated quickly away. Officer Parker followed the Sebring as it sped out of the alley—going 30 to 35 miles per hour in a 15-mile per hour zone—and turned right without stopping at the end of the alley or signaling for the turn. Officer Parker tried to get behind the Sebring to conduct a traffic stop, but the Sebring sped onto the 118 Freeway with Officer Parker still in pursuit. Officer Parker accelerated, followed the Sebring onto the freeway, and turned on the patrol vehicle's lights and siren. The Sebring exited the freeway and came to a stop.

Officer Parker requested backup units and conducted a traffic stop. Weddington and Nunnery were passengers in the car driven by Bashir, who was driving on a suspended license. The Sebring was impounded and searched. The destination on the GPS on Weddington's cell phone was an address located in the southern part of Los Angeles. In the search, police recovered a crowbar, a window punch, two flathead screwdrivers, one with a bent tip, a Phillips-head screwdriver, a tire repair tool, a pair of two-way radios, one black glove, two empty backpacks, and a pair of white gloves. Another pair of black gloves was recovered from Nunnery's pocket. Los Angeles Police Officer Benjamin Sadeh described how these items could be used in a burglary and opined that most of these items were common burglary tools.

### September 26, 2011[5]

Midmorning on September 26, 2011, a multi-unit team of the Los Angeles Police Department conducted undercover surveillance of the red Chrysler Sebring starting in the southern part of Los Angeles and continuing north along the 405 Freeway into the San Fernando Valley. Officers in a helicopter tracked the Sebring using a powerful magnifying camera, which enabled them to see people on the ground from an altitude of 6,500 to 8,000 feet. The officers in the helicopter were in contact with numerous officers on the ground in unmarked vehicles who were using the information provided by the

---

[5] The trial court dismissed count 12 pursuant to defense motions for judgment of acquittal. (§ 1118.1.) Accordingly, evidence relating to that count is omitted.

airship to follow the Sebring and relay street names and house numbers back to the helicopter.

The helicopter tracked the Sebring as it exited the freeway in Northridge and slowly drove through side streets, occasionally stopping in front of homes. Eventually, the Sebring stopped in front of a house on the 9000 block of Gothic Avenue. After about five minutes, the female driver exited the vehicle, walked to the front door of the house, and knocked on the door for one to two minutes. No one opened the door. The woman returned to the Sebring and drove away.

The Sebring stopped in front of the home of Julianne McCloskey on the 9000 block of Gerald Avenue. Once again, the driver got out of the car, walked up to the front door of the house, knocked, and stood there for about a minute and a half. No one came to the door. The driver then peeked over the side gate of the house before returning to the car. After a few minutes the Sebring pulled away.[6]

The Sebring then parked across the street from a home on the 16000 block of Tupper Street. Again, the driver exited the vehicle and knocked on the front door of the house for about a minute. No one came to the door. The driver looked over the gate on the side of the house before returning to the Sebring. After about five minutes the Sebring drove away.

Police next observed the Sebring stop in front of the home of Kin Fong on the 16000 block of Labrador Street. Fong was not home. The female driver got out of the car and walked up the driveway to the front door of the house. After knocking on the

---

[6] Although McCloskey had been home part of the day, she had not seen appellants on her property or in the area of her house. However, sometime between March 31 and April 15, 2011, Bashir had approached McCloskey at her house, claiming she was selling some kind of cleaner. McCloskey became suspicious when she learned that Bashir had only one bottle of the cleaner, and told Bashir she did not allow solicitors on her property and was not interested. The encounter stuck in McCloskey's memory because Bashir had retorted, "Well, did your children eat today?" McCloskey offered to give Bashir food if she needed to feed her children, but Bashir responded with an expletive and walked away.

door for a minute or two and receiving no response, she walked to the side gate and looked into the backyard. As she had done after knocking on the doors of the previous homes, the woman went back to the Sebring and sat in the driver's seat. This time, however, the Sebring did not pull away. After about five minutes, a thin male emerged from the backseat of the Sebring and went through the gate to the backyard. A heavier male then got out of the front passenger seat of the Sebring and joined the thinner man in the backyard. The men opened a window through which they entered the house. After about 10 to 15 minutes, both men exited through the front door carrying small bags and pillowcases which appeared to be weighted down.[7]

A marked police car followed the Sebring when it left the Fong residence. As police attempted to conduct a traffic stop, the Sebring began to pull over to the right and slow down, but suddenly accelerated and sped away. During the ensuing police chase, the Sebring ran several red lights in heavy traffic, and money, coins, jewelry, clothing, and video game cartridges were thrown from all four of the Sebring's windows. Some of the coins hit the windshield of the closest police car.

The Sebring eventually crashed, and the three occupants of the vehicle ran in different directions. Police took up the chase on foot, and Bashir, Weddington, and Nunnery were apprehended and taken into custody. As Nunnery was being apprehended, he spun around and elbowed the arresting officer in the face, breaking his nose.[8]

### Gang Evidence

In a bifurcated bench trial, the prosecution presented evidence in support of the gang enhancement allegations that Weddington, Nunnery, and Bashir were all members

---

[7] When Fong returned home, she found her house had been ransacked and property worth more than $1,000 was missing.

[8] Based on this conduct, Nunnery was charged individually in count 5 with battery with injury on a peace officer, with a special allegation of personal infliction of great bodily injury on a peace officer. (§ 243, subd. (c)(2).) Following the jury's deadlock on count 5, the court declared a mistrial as to that count, and Nunnery pleaded guilty to misdemeanor battery.

of the Clover subset of the "Seven Trey Gangster Hustler Crip" criminal street gang (STGH), an offshoot of the original Crips gang. They all had numerous STGH tattoos. The prosecution gang expert testified that gang tattoos were earned by "putting in work" for the gang, that is, committing crimes for the gang's benefit. An individual with STGH tattoos who is not a member of STGH but is present in the gang's territory risks serious injury or even being killed.

The prosecution also presented evidence about a traffic stop on August 11, 2011, in which Weddington and Nunnery were passengers in a car driven by Fawzy Shabib. Police conducting the stop found two loaded handguns in the vehicle. A DNA profile obtained from the handgun closest to Weddington matched his DNA profile. That handgun was loaded with six live rounds and its safety was off. During the stop, the officer noted Weddington's and Nunnery's numerous gang-related tattoos. Subsequently, the officer saw a YouTube video featuring Shabib claiming membership in the Clover subset of the STGH gang, throwing gang signs, and using gang vernacular to disparage other gangs. The prosecution's gang expert opined that the circumstances of the traffic stop were consistent with Weddington's and Nunnery's active membership in STGH.

According to the prosecution gang expert, the burglary and attempted burglaries represented a signature crime of STGH, known as "floccin'," in which Crip gang members leave their territory in the southern part of Los Angeles to commit daytime burglaries of residences in the San Fernando Valley suburbs. The term "floccin'" is derived from so-called "knock-knock burglaries," in which one of the perpetrators knocks on the door of a target residence to determine if anyone is home. The gang expert described a YouTube video he had seen by a STGH gang member known as "Cowboy" which depicted floccin' as a residential daytime burglary in which jewelry and other small items are taken and the perpetrators flee in a getaway car. The expert explained that if a woman participates in the crime, she is usually the driver of the getaway vehicle.

**DISCUSSION**

## I. Substantial Evidence Supports the Attempted Burglary Convictions

Appellants contend there was no evidence that appellants' conduct had progressed beyond planning and preparation, and therefore their convictions for attempted burglary in counts 2, 9, 10, and 11 must be reversed for insufficient evidence. We disagree.

A criminal attempt occurs when there is a specific intent to commit the crime and a direct but ineffectual act done toward its commission. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1192; *People v. Bonner* (2000) 80 Cal.App.4th 759, 764.) "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1021; *People v. Toledo* (2001) 26 Cal.4th 221, 230.) "The act that goes 'beyond mere preparation' need not constitute an element of the target crime [citation], and it ' "need not be the ultimate step toward the consummation of the design." ' [Citation.] Instead, ' "it is sufficient if [the conduct] is the first or some subsequent act directed towards that end after the preparations are made." ' [Citation.] In other words, . . . the act must represent ' "some appreciable fragment of the crime." ' " (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1021; *People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1192; *People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).)

Our Supreme Court has "recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' " (*Decker*, *supra*, 41 Cal.4th at p. 8; *People v. Davis* (2009) 46 Cal.4th 539, 606.) In the face of such manifest intent, "an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown." (*People v. Bonner*, *supra*, 80 Cal.App.4th at p. 764.) Indeed, "the plainer the intent to commit the offense, the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement." (*People v. Dillon* (1983) 34 Cal.3d 441, 455; *People v. Anderson* (1934) 1 Cal.2d 687, 690.)

Appellants characterize their acts of driving through neighborhoods and knocking on doors merely as preparation to commit burglary, which falls short of the overt act necessary to establish an attempt. We disagree.

In reviewing appellants' challenge to the sufficiency of the evidence, we examine the whole record in the light most favorable to the judgment, drawing all reasonable inferences in favor of the verdict, and presuming "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Maciel* (2013) 57 Cal.4th 482, 515.) " 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." ' " (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Kraft*, *supra*, 23 Cal.4th at pp. 1053–1054; *People v. Zamudio* (2008) 43 Cal.4th 327, 358.) It is not the role of the appellate court to reweigh the evidence or reevaluate witnesses' credibility. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Indeed, reversal for lack of substantial evidence is warranted only if " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *People v. Zamudio*, *supra*, 43 Cal.4th at p. 357; *People v. Pre* (2004) 117 Cal.App.4th 413, 421.)

Instructing on the elements required to prove an attempted burglary, the trial court explained that "[a] direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action." The court further instructed that "[a] person who attempts to commit burglary is guilty of attempted burglary even if, after

9

taking a direct step towards committing the crime, he or she abandoned further efforts to complete the crime."**9** (CALCRIM No. 460; 1 Witkin, Cal. Criminal Law (4th ed. 2012) Elements, § 71, p. 363; see also *People v. Staples* (1970) 6 Cal.App.3d 61, 69; *People v. Carter* (1925) 73 Cal.App. 495, 500.)

Here, the evidence amply supported the jury's finding that appellants had completed their planning and preparation to commit burglaries when they traveled from the southern part of Los Angeles to the San Fernando Valley with tools in the car to aid in the commission of those burglaries. Appellants' unusual conduct, which included driving slowly through the targeted neighborhoods, parking in front of certain residences for several minutes, knocking on the front doors of those houses for one to two minutes, and peering over gates into backyards, was not the behavior of an innocent visitor to a neighborhood. The jury could thus reasonably conclude that appellants' acts constituted direct movements toward the commission of burglary after the preparations had been made, representing implementation of the plan and the commencement of the consummation of the crime. (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1021; *Decker*, *supra*, 41 Cal.4th at p. 8; *People v. Toledo*, *supra*, 26 Cal.4th at p. 230.)

Further, even though appellants apparently decided not to complete the burglaries of some of the homes they targeted, the evidence supported the jury's conclusion that appellants had already taken steps to implement their plan. At this point, a voluntary withdrawal—even one occasioned by a change of heart (of which there is no evidence here)—would constitute no defense to the charge of attempted burglary. (*People v. Robinson* (1960) 180 Cal.App.2d 745, 750–751; see also *People v. Stewart* (1893) 97 Cal. 238, 240 ["The fact that [defendant] abandoned his wicked purpose upon the approach of other parties has not the slightest tendency to purge him of the legal consequences of his criminal conduct. If an assault with the intent here alleged is made,

---

**9** Appellants do not challenge the propriety of these instructions.

10

it is no less a crime, though the aggressor should abandon his intentions before the consummation of the act, by reason of the pains of a stricken conscience alone"].)

There was also abundant evidence in this case from which the jury could infer appellants' intent to commit a string of residential burglaries. Appellants were apprehended on September 7 with burglary tools in their car. And they followed the identical pattern for the residence they actually burglarized as they had for all the other targeted homes: In midmorning during the week when most people are at work, appellants drove a significant distance from their homes to a San Fernando Valley suburb, slowly cruising through residential neighborhoods. They parked on the street in front of a house, and while the two men waited in the car, Bashir got out and stood at the front door for an unusually long time, knocking for one to two minutes. When no one came to the door, she looked over the gates of two of the homes. After Bashir returned to the Sebring, appellants remained parked on the street for several more minutes before either moving on to the next target or burglarizing the home. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1257 (*Prince*).)

In *Prince*, the defendant challenged the sufficiency of the evidence in support of his attempted burglary conviction as appellants do here, on the ground that the evidence "consisted of nothing more than an innocent knock at the door, accompanied by an inquiry after a friend." (*Prince*, *supra*, 40 Cal.4th at p. 1257.) Citing the defendant's completed burglary a month after the attempt and his pattern of conduct in committing the attempted burglary and other crimes, the Supreme Court found "ample evidence that [the] approach to the [victim's] residence also constituted an attempted burglary in which defendant's activities went beyond mere preparation." (*Ibid*.)

Here, as in *Prince*, the completed burglary together with appellants' strikingly similar methods of operation for every one of the targeted residences clearly demonstrated their intent to burglarize homes in the area. (*Prince*, *supra*, 40 Cal.4th 1179; see also *People v. Davis*, *supra*, 46 Cal.4th at pp. 606–607; *People v. Ansaldo* (1998) 60 Cal.App.4th 1190, 1197.) And unlike *Prince*, no innocent purpose was even suggested, nor is any apparent from appellants' conduct. As set forth above, in the face

11

of such overwhelming evidence of intent to commit the target crime, only " 'slight acts in furtherance of the design will constitute an attempt.' " (*Decker*, *supra*, 41 Cal.4th at p. 8; *People v. Davis*, *supra*, 46 Cal.4th at p. 606.) Moreover, where, as here, intent is so clearly demonstrated, " ' "the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime." ' " (*People v. Davis*, *supra*, 46 Cal.4th at p. 606.)

In challenging the sufficiency of the evidence to support appellants' convictions for attempted burglary, appellants and the dissent focus narrowly on Bashir's conduct of approaching and knocking on the front door of each of the targeted homes to argue that appellants' conduct amounted to no more than preparation to commit burglary. (See conc. & dis. opn. at pp. 1–6, *post*.) But our substantial evidence review requires that we consider the totality of the evidence presented, including the reasonable inferences to be drawn from that evidence, and conduct our review in the light most favorable to the judgment. (*People v. Maciel*, *supra,* 57 Cal.4th at p. 515; *People v. Johnson* (1980) 26 Cal.3d 557, 576.) Such review does not permit an appellate court to second-guess the jury in its evidentiary assessments. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357–358.)

The dissent contends that appellants' "scouting or casing did not constitute an unequivocal commitment to breaking in to the houses: They might break into the house, but they might keep looking. In fact, defendants did not break into any of these houses and instead kept looking until they found what they considered a suitable target." (Conc. & dis. opn. at pp. 3–4, *post*.) By focusing on appellants' "equivocation," however, the dissent reweighs the evidence to determine that the circumstances might reasonably be reconciled with a finding that appellants' conduct had not yet crossed the line from mere preparation to implementation of their plan. But the jury evaluated the same evidence and reached a different determination, reasonably concluding that appellants' conduct— driving slowly through neighborhoods far from where they lived and equipped with tools for committing burglaries, parking in front of certain residences for several minutes,

12

knocking on the front doors of those houses for an unusual length of time, and peering into backyards—constituted direct movements toward the commission of burglary *after* the preparations had been made.  Whether such conduct demonstrated "equivocation" was for the jury to decide, and the reviewing court's opinion that the facts may be susceptible to more than one reasonable interpretation cannot form the basis for reversal of the judgment.  (*People v. Kraft*, *supra*, 23 Cal.4th at pp. 1053–1054; *People v. Zamudio*, *supra*, 43 Cal.4th at p. 358.)

The dissent distinguishes the recent case of *People v. Zaun* (March 25, 2016, C078962) ___ Cal.App.4th ___ [2016 Cal.App. Lexis 225] (*Zaun*) on the ground that in this case, "unlike in *Zaun*, there is no evidence that the defendants' intent to burgle was frustrated by the presence of unwanted occupants."  (Conc. & dis. opn. at p. 5, *post*.)  In *Zaun*, the defendant challenged the sufficiency of the evidence in support of his convictions for attempted burglary on the ground that the evidence established only that he and his associates were casing houses, but not that they had formed the requisite intent to commit burglary.  (*Zaun*, at p. ___ [2016 Cal.App. Lexis 225, at *3].)  There, as in *Prince* and this case, the defendant and his associates took turns knocking on the doors of houses, making some pretense for the visit if someone answered the door, and burglarizing three homes where no one answered the door.  The court noted that the circumstantial evidence of the defendant's intent was susceptible of two interpretations by the jury, one innocent, the other guilty.  Citing the familiar principles of substantial evidence review set forth above, the court concluded that the defendant's attempted burglary convictions were based on logical inferences the jury had drawn from the evidence, which the court must accept on appeal.  (*Id.* at p. ___ [2016 Cal.App. Lexis 225, at *3–*4]; *People v. Maury*, *supra*, 30 Cal.4th at p. 396.)

Here, as in *Zaun*, substantial evidence supported the jury's conclusion that appellants intended to commit burglary.  In this case, the jury also reasonably determined that appellants' acts of cruising through a residential neighborhood, knocking on doors and looking over fences constituted the implementation of their plan to burglarize homes in the area after the preparations had been made.  As set forth above, such acts " 'need

13

not be the ultimate step toward the consummation of the design,' " but may even be the first act that goes " 'beyond mere preparation' " and represents " ' "some appreciable fragment of the crime." ' " (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1021; *People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1192; *People v. Toledo*, *supra*, 26 Cal.4th at p. 230 ["Under the provisions of section 21a, a defendant properly may be found guilty of [an attempt crime] whenever, acting with the specific intent to commit the offense . . . , the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action"].)

An examination of the whole record in this case reveals abundant evidentiary support for the jury's determination that appellants had progressed beyond planning and preparation, and their conduct constituted the execution of the planned burglaries. Based on the totality of the evidence, we therefore reject appellants' challenge to the sufficiency of the evidence supporting their convictions for attempted burglary.

## II. Substantial Evidence Supports the Trial Court's True Findings on the Gang Allegations

Appellants contend that the trial court's true findings on the gang enhancements must be reversed because the only evidence supporting them was the conclusory opinion of the prosecution's gang expert. We disagree.

The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction. (*People v. Wilson* (2008) 44 Cal.4th 758, 806; *People v. Mejia* (2012) 211 Cal.App.4th 586, 614.) And like a conviction lacking substantial evidentiary support, a true finding on a gang enhancement that is not supported by substantial evidence violates a defendant's federal and state constitutional rights and must be reversed. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656–657.)

"In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.) " 'Expert opinion that

particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support [a] gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

Appellants observe that expert testimony that is unsupported by any evidence that the crime was gang-related is insufficient to support a gang enhancement. (*People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 657.) Relying on the court's reversal of the gang enhancement for insufficient evidence in *People v. Ramon* (2009) 175 Cal.App.4th 843, 849, 851, 853, appellants contend that reversal is required here, where the "actual, direct evidence shows only offenses committed by gang members, not that the offense[s] were committed with the specific intent to benefit the gang or that the offenses had any gang-related purpose whatsoever." But appellants' argument ignores the evidence upon which the trial court was entitled to rely that supported its findings on the gang enhancement.

There are two "prongs" to the gang enhancement under section 186.22, subdivision (b)(1). (*People v. Albillar* (2010) 51 Cal.4th 47, 59 (*Albillar*).) The first prong requires that the prosecution prove the underlying felony was "gang-related." (*Id.* at p. 60; *People v. Gardeley* (1996) 14 Cal.4th 605, 622.) The second prong "requires that a defendant commit the gang-related felony 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' "[10] (*Albillar*, at p. 64; § 186.22, subd. (b)(1).)

Section 186.22, subdivision (b)(1) provides three alternatives for establishing the first prong—that the underlying offense was "gang-related." The offense may be

---

[10] "In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. (§ 186.22, subds. (e) and (f).)" (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 617.) Appellants' challenge here goes only to the sufficiency of the evidence in support of the "gang-related" and specific intent elements.

15

committed:  (1) for the benefit of a gang; (2) at the direction of a gang; *or* (3) in association with a gang.  (See *Albillar*, *supra*, 51 Cal.4th at pp. 59–60.)  Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member.  (*People v. Leon* (2008) 161 Cal.App.4th 149, 162; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)  The first prong therefore may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were "on a frolic and detour unrelated to the gang."  (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198; see also *Albillar*, *supra*, 51 Cal.4th at pp. 61–62.)

The record in this case amply supports the trial court's finding that appellants committed the underlying offenses as gang members acting in association, thus satisfying the "gang-related" prong of the statute.  (See *Albillar*, *supra*, 51 Cal.4th at p. 62 ["defendants came together *as gang members* to attack [the victim] and, thus, . . . they committed these crimes in association with the gang"]; *People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198 ["the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

The prosecution presented substantial evidence that all three appellants were active members of STGH.  They all had STGH tattoos.  And the circumstances of the August 18, 2011 traffic stop involving Nunnery and Weddington were consistent with active STGH gang membership.  The burglary and attempted burglaries represented a signature crime of STGH, known as "floccin'," in which Crip gang members leave their territory in the southern part of Los Angeles to commit daytime burglaries of residences in the San Fernando Valley suburbs.  Indeed, the burglary in this case followed the exact pattern of the typical "floccin'" burglary depicted in the YouTube video, wherein the perpetrators commit a daytime break-in to steal jewelry and other small items and flee in a getaway car.  There was no evidence to suggest the "floccin'" here constituted a "frolic and detour" distinct and independent of the criminal activities of the gang.

The fact that these three gang members came together to commit these crimes also satisfies the second prong of section 186.22, subdivision (b)(1), that the "defendant commit the gang-related felony 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*Albillar*, *supra*, 51 Cal.4th at p. 64.) "There is no statutory requirement that this 'criminal conduct by gang members' be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing." (*Albillar*, *supra*, at p. 66; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354.) Indeed, as our Supreme Court has held, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.)

Contrary to appellants' assertion, the expert's testimony in this case was not merely the expert's unsubstantiated opinion about how the gang determination should be made. Rather, the expert's opinion was supported by evidence concerning the manner in which these crimes were carried out and appellants' active gang membership. Appellants' substantial evidence challenge to the trial court's gang enhancement determination is without merit.

## III. Appellants' Convictions for Evading a Peace Officer in Willful Disregard for Safety Find Substantial Evidentiary Support in the Record

Neither Weddington nor Nunnery was alleged to have been driving the Sebring at any time on September 26, 2011. Appellants therefore contend the evidence is insufficient to support Weddington's and Nunnery's convictions on count 4 for evading a peace officer in a willful or wanton disregard for safety. We disagree.

To establish a violation of Vehicle Code section 2800.2, subdivision (a), the prosecution was required to prove that while driving a vehicle in a willful or wanton disregard for the safety of persons or property, the appellants fled or attempted to elude a police officer pursuing in a vehicle. (Veh. Code, § 2800.2, subd. (a); *People v. Sewell*

17

(2000) 80 Cal.App.4th 690, 695, disapproved on another ground in *People v. Howard* (2005) 34 Cal.4th 1129, 1139, fn. 5; CALCRIM No. 2181.) " ' "Wantonness includes the elements of consciousness of one's conduct, intent to do or omit the act in question, realization of the probable injury to another, and reckless disregard of consequences." [Citation.] . . . The word "willful" in this connection means "intentional" [citations]. The intention here referred to relates to the disregard of safety, etc., not merely to the act done in disregard thereof.' " (*People v. Schumacher* (1961) 194 Cal.App.2d 335, 340.) Vehicle Code section 2800.2, subdivision (b) further provides that "a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under [Vehicle Code] Section 12810 occur, or damage to property occurs."

The prosecution in this case presented alternative theories to establish the charge of evasion against Weddington and Nunnery: The evasion was a natural and probable consequence of a burglary aided and abetted by Weddington and Nunnery, or a natural and probable consequence of a burglary that appellants conspired to commit.

At the heart of the natural and probable consequences doctrine lies reasonable foreseeability. Our Supreme Court has explained: " 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*); *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133; *People v. Prettyman* (1996) 14 Cal.4th 248, 260–262.)

18

The high court continued: " '[A]lthough variations in phrasing are found in decisions addressing the doctrine—"probable and natural," "natural and reasonable," and "reasonably foreseeable"—the ultimate factual question is one of foreseeability.' [Citation.] Thus, ' "[a] natural and probable consequence is a foreseeable consequence." ' " (*Medina*, *supra*, 46 Cal.4th at p. 920; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*Medina*, *supra*, 46 Cal.4th at p. 920.)

The natural and probable consequences doctrine applies with equal force to cases involving the vicarious liability of conspirators for a crime committed in furtherance of the conspiracy. (*People v. Prieto* (2003) 30 Cal.4th 226, 249–250.) "One who conspires with others to commit a felony is guilty as a principal. (§ 31.) ' "Each member of the conspiracy is liable for the acts of any of the others in carrying out the common purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." ' " (*In re Hardy* (2007) 41 Cal.4th 977, 1025–1026.) " '[E]ach conspirator is bound by the acts of a confederate in furthering the *common* design of the conspiracy by escaping or resisting arrest, even though such acts may have been "dictated by the exigencies of the moment." ' " (*People v. Garewal* (1985) 173 Cal.App.3d 285, 296, quoting *People v. Smith* (1966) 63 Cal.2d 779, 794.)

Appellants acknowledge that a rational jury could find it reasonably foreseeable that the driver of a vehicle fleeing after the commission of a felony might attempt to evade police. They nevertheless maintain it was not foreseeable that, while evading the police, Bashir would drive the car in willful or wanton disregard for the safety of persons or property. In support of their claim, appellants assert that Bashir's reckless driving was not foreseeable "based on the planning, the accomplished burglary, or the previous encounter with the police on September 7, 2011." To the contrary, there was abundant evidence that Nunnery and Weddington expected Bashir to drive the getaway vehicle in whatever manner was necessary to elude the police and avoid apprehension, regardless of any danger to persons or property. Given appellants' flight from police after the

19

attempted burglary on September 7, it was certainly predictable that Bashir would again attempt to evade police after the burglary on September 26.  During the police chase that followed the burglary of the Fong residence, all of the occupants of the vehicle threw stolen property and other items out of the car, some of which hit one of the pursuing police cars.  Moreover, despite the lack of evidence that Nunnery and Weddington were directing or controlling the manner in which Bashir was driving, the evidence established that both men took advantage of the crash that resulted from Bashir's reckless driving by exiting the vehicle and fleeing on foot.

Appellants' argument also ignores the principle that " 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough." ' " (*Medina*, *supra*, 46 Cal.4th at p. 920.)  Given the substantial evidence that execution of the common design included the use of a getaway car to avoid apprehension, Weddington and Nunnery certainly could have foreseen Bashir's reckless driving in evading the police.  Their convictions on count 4 are supported by substantial evidence.

## IV.  The Trial Court Had No Sua Sponte Duty to Instruct the Jury on the Lesser Included Offense of Misdemeanor Evading

Appellants assert that although Bashir may have driven the Sebring with willful or wanton disregard for safety, there was sufficient evidence that the offenses as committed by Weddington and Nunnery were less than that charged to warrant instruction on the lesser included offense of misdemeanor evasion.  (Veh. Code, § 2800.1; *People v. Springfield* (1993) 13 Cal.App.4th 1674, 1680–1681.)  According to appellants, the trial court erred in failing to instruct, sua sponte, on the lesser included offense of misdemeanor evading.  We disagree.

Appellants did not request an instruction on misdemeanor evading.  Nevertheless, " ' "[i]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are

20

necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

However, "[s]peculation is insufficient to require the giving of an instruction on a lesser included offense." (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.) Indeed, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) "[A] lesser included instruction need not be given when there is no evidence that the offense is less than that charged." (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 174.)

"It is well settled that 'the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense.' (*People v. Kelly* (1990) 51 Cal.3d 931, 959.)" (*People v. Trimble* (1993) 16 Cal.App.4th 1255, 1260.) Here, there was no evidence that appellants Weddington and Nunnery committed misdemeanor evading but not felony evading. Thus, the evidence did not warrant an instruction on the lesser included offense.

The only distinction between the crimes of felony and misdemeanor evading is that in committing the felony, the pursued vehicle is driven " 'in a willful or wanton disregard for the safety of persons or property.' " (*People v. Springfield*, *supra*, 13 Cal.App.4th at p. 1680; Veh. Code, § 2800.2.) The crime of misdemeanor evading is

accomplished without willful or wanton disregard for safety. (Veh. Code, § 2800.1.)[11] Thus, if the evidence shows that the defendant "fle[d] or attempt[ed] to elude a pursuing peace officer in violation of [Vehicle Code] Section 2800.1 and the pursued vehicle [was] driven in a willful or wanton disregard for the safety of persons or property," the defendant is guilty of felony, not misdemeanor evading. (Veh. Code, § 2800.2.)

The fact that Weddington and Nunnery were passengers in the car is irrelevant to the question of whether the vehicle was driven " 'in a willful or wanton disregard for the safety of persons or property.' " (*People v. Springfield*, *supra*, 13 Cal.App.4th at p. 1680; Veh. Code, § 2800.2.) Only one person could drive the getaway car at a time, and that person was Bashir. However, despite the lack of evidence that Nunnery or Weddington directly controlled the vehicle, the evidence supported an inference that both men contributed to and took full advantage of Bashir's reckless driving in heavy traffic by throwing money, coins, jewelry, clothing, and video game cartridges from the getaway car's windows, and then exiting the vehicle and fleeing on foot after the crash. Indeed, appellants' complete disregard for the safety of persons or property is exemplified by Nunnery's battery on the police officer as he was being apprehended following the crash. Weddington's and Nunnery's own conduct during the evasion and after the getaway car crashed demonstrated that if they were guilty of any crime of evading at all, it was the felony and not the misdemeanor: As full participants in the efforts to elude the police and avoid apprehension, they indisputably committed the crime "in a willful or wanton disregard for the safety of persons or property." (Veh. Code, § 2800.2.)

The dissent asserts that because substantial evidence supported a finding "that it was reasonably foreseeable that Bashir would flee from and attempt to evade police officers, but not with wanton and willful disregard for persons and property," instructions

---

[11] Vehicle Code section 2800.1 provides in relevant part: "Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor." (*Id.*, subd. (a).)

22

on the lesser offense were required.  (Conc. & dis. opn. at p. 8, *post*.)  In support of this conclusion, the dissent speculates that the greater risk to the occupants of the getaway car, increased punishment if they were caught, and the low probability of actually getting away reduced the foreseeability that Bashir would drive recklessly in order to avoid apprehension after the burglary.  (*Ibid.*)  Thus, according to the dissent, "reckless driving from the scene of the crime was not inevitable."  (*Ibid.*)  However, no evidence supports the dissent's supposition, and, as set forth above, an instruction on a lesser included offense is not required on the basis of mere speculation.  (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 174.)  Furthermore, no instruction on a lesser included offense is justified simply on the basis of " '*any* evidence, no matter how weak.' "  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)  Finally, it bears repeating that no instructional duty arises if the evidence establishes that the defendant, if guilty at all, was guilty of the greater offense.  (*People v. Kelly*, *supra*, 51 Cal.3d at p. 959; *People v. Trimble*, *supra*, 16 Cal.App.4th at p. 1260.)

Here, the evidence did not warrant an instruction on the lesser offense because there was simply no evidence that appellants Weddington and Nunnery committed misdemeanor evading *but not* felony evading.  In the absence of substantial evidence the offense was anything less than that charged, the trial court had no sua sponte duty to instruct the jury on the lesser included offense of misdemeanor evading.

## V.   Appellants Have Forfeited Any Claim on Appeal Regarding the Trial Court's Exercise of Its Sentencing Discretion as to Count 8

Pursuant to section 186.22, subdivision (d), the trial court imposed and stayed a felony sentence on count 8, possession of burglary tools.  Appellants contend that the trial court appears to have been unaware that it had discretion to impose a misdemeanor rather than a felony sentence on that count.  Appellants thus maintain that remand is required to enable the trial court to exercise its discretion regarding their sentences on the count 8 conviction.  However, because appellants failed to request that the trial court treat the conviction for possession of burglary tools as a misdemeanor and did not object to the trial court's discretionary sentencing choice, we conclude appellants' claim is forfeited.

(*People v. Scott* (1994) 9 Cal.4th 331, 356.) In any event, the record does not support appellants' contention that the trial court was unaware of the scope of its sentencing discretion. Remand is therefore unwarranted in this case.

In both of its sentencing memoranda, the prosecution stated that section 186.22, subdivision (d) "transforms the misdemeanor PC section 466 into a felony with a 1, 2, or 3 year range." Neither Weddington nor Bashir filed a sentencing memorandum. Nunnery filed two sentencing memoranda, but did not address the trial court's discretion under section 186.22, subdivision (d) to sentence count 8 as a misdemeanor or a felony. At their sentencing hearings, none of the appellants requested that the trial court sentence count 8 as a misdemeanor rather than as a felony.

"In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have *required* parties to raise certain issues at the time of sentencing. In such cases, lack of a timely and meaningful objection forfeits or waives the claim." (*People v. Scott*, *supra*, 9 Cal.4th at p. 351; *People v. Gonzalez* (2003) 31 Cal.4th 745, 748 ["a party in a criminal case may not challenge the trial court's discretionary sentencing choices on appeal if that party did not object at trial"]; see also *People v. Welch* (1993) 5 Cal.4th 228, 234–235.) In this case, appellants had ample opportunity to contest the prosecutor's statement in the sentencing memoranda that count 8 should be sentenced as a felony pursuant to section 186.22, subdivision (d), but failed to do so. At the sentencing hearing, when the prosecutor advocated for felony sentencing on count 8, and the court indicated its intent to impose the high term, appellants remained silent. Their claim on appeal is therefore forfeited.

In any event, the record does not support appellants' contention that the trial court was unaware of its discretion to impose a misdemeanor as opposed to a felony sentence for count 8. Appellants point to the trial court's apparent confusion over the imposition of the sentence on count 8 during Nunnery's sentencing hearing as evidence that the court was unaware of its discretion and thus failed to exercise it. While the colloquy during Nunnery's hearing leaves some ambiguity about the court's understanding of its sentencing choices under section 186.22, subdivision (d), the court's statements during

24

Bashir's sentencing hearing reveal the court was fully aware of its sentencing discretion and purposefully exercised it: "Then that takes us back to count eight, the 466, which is a misdemeanor burglary tools; and it was called to my attention that 186.22 (b) [*sic*] converts that into a felony, and *it could either be one year misdemeanor . . . with no less than 180 in the county jail or one, two or three; and I'm imposing the high term of three years* because of the gang allegation under the (d) section and under 654 I am imposing it and staying it . . . ." (Italics added.)

On appeal, we presume that the trial court followed established law and thus properly exercised its discretion in sentencing a criminal defendant. (See, e.g., *People v. Coddington* (2000) 23 Cal.4th 529, 644 [reviewing court presumes trial court knew and applied correct statutory and case law], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Esparza* (2015) 242 Cal.App.4th 726, 742.) Thus, we may not assume the court was unaware of its discretion simply because it failed to explicitly refer to its alternative sentencing choices. (*People v. Bolian* (2014) 231 Cal.App.4th 1415, 1421; *People v. Fuhrman* (1997) 16 Cal.4th 930, 933, 944–947.)

## DISPOSITION

The judgments are affirmed. The trial court is directed to correct Nunnery's abstract of judgment to reflect imposition of a one-year consecutive sentence on count 5, for an aggregate term of 14 years 4 months in state prison, and forward a corrected copy to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PUBLICATION.


LUI, J.

I concur:


JOHNSON, J.


25

ROTHSCHILD, P. J., concurring and dissenting:

I concur in parts II, III, and V of the majority's discussion, I concur in part and respectfully dissent in part to part I, and I respectfully dissent from part IV.

I.     *Attempted Burglary*

A jury convicted defendants of burglary of a house on Labrador Street and attempted burglary of houses on Gothic Avenue, Gerald Avenue, and Tupper Street. The majority affirms all of the convictions. I, however, believe that the evidence is insufficient to support the jury's verdicts that defendants are guilty of the three attempted burglaries. I would therefore reverse the convictions for attempted burglary on counts 9 (Gothic Avenue), 10 (Gerald Avenue), and 11 (Tupper Street).

The defendants drove from the southern part of Los Angeles to the San Fernando Valley. After reaching the Northridge area, they drove slowly in and out of residential streets for about an hour and a half, stopping for a minute or two outside several houses. Bashir was driving, Nunnery was in the front passenger seat, and Weddington was in a rear seat. When they stopped outside a residence on Gothic Avenue, they waited in the car for about five minutes. Bashir then walked to the front door and knocked while Weddington and Nunnery waited in the car. When no one answered, Bashir returned to the car. Defendants then drove to a house on Gerald Avenue. Bashir knocked on the door and, when no one answered, peeked over a side gate. She returned to the car where defendants waited for a couple minutes. They then drove to a house on Citronia Street, where Bashir knocked on the door and returned to the car when no one answered.[1] They remained there for a couple minutes, then drove to a house on Tupper Street, where Bashir again knocked on the door, peeked over a gate, and returned to the car. After waiting for about five minutes, defendants drove to a residence on Labrador Street.

---

[1] The information included a count alleging that defendants attempted to burgle a house on Citronia Street, based on knocking on the front door of the house. The court dismissed the count pursuant to Penal Code section 1118.1 for reasons not apparent in the record.

Bashir knocked on the door to the Labrador Street house, looked over the fence, returned to the car, and waited with the others for about five minutes. Bashir remained in the car while Weddington exited the car and entered the backyard of the house. Within a couple minutes, Nunnery joined Weddington in the backyard. They then entered the house through a back window. About 10 minutes later, the two left the house via the front door carrying property taken from the house.

The majority correctly states the general principles concerning the law of attempt, which distinguishes preparation to commit a crime from acts that go beyond mere preparation and constitute " ' " 'some appreciable fragment of the crime.' " ' [Citation.]" (Maj. opn. *ante*, at p. 8.) As our Supreme Court has explained, the required act " 'must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation.' " (*People v. Miller* (1935) 2 Cal.2d 527, 530 (*Miller*).) The "consummation" of a burglary occurs when the perpetrator enters a building with the intent to commit larceny or any felony. (Pen. Code, § 459; *Magness v. Superior Court* (2012) 54 Cal.4th 270, 273.) "Commencement" in this context is the point at which the perpetrator's actions are no longer equivocal and it appears that the crime "will be consummated unless interrupted by circumstances independent of the will of the attempter." (*People v. Buffum* (1953) 40 Cal.2d 709, 718; see also *People v. Dillon* (1983) 34 Cal.3d 441, 455 ["when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway"]; *People v. Murray* (1859) 14 Cal. 159, 160 [the attempt "must be manifest by acts which would end in the consummation of the particular offense, but for the intervention of circumstances independent of the will of the party"].)

In *Miller*, *supra*, 2 Cal.2d 527, the Supreme Court emphasized that the line between preparation and attempt is crossed only when the perpetrator's conduct "cease[s] to be equivocal." (*Id.* at p. 531.) In that case, the defendant threatened in the presence of others to kill Albert Jeans because Jeans had allegedly "been annoying his wife" and "the authorities would not take charge of the matter." (*Id.* at p. 529.) That afternoon, Jeans was working at a ranch owned by the town constable. Defendant went to the ranch

2

and, holding a rifle, walked toward both the constable and Jeans. The constable was 250 or 300 yards away and Jeans was about 30 yards behind the constable. After walking about 100 yards toward them, the defendant loaded his rifle, but never lifted it to take aim. Jeans ran off at a right angle to the defendant's line of approach. The defendant continued walking toward the constable, who took the defendant's gun without resistance. (*Ibid.*)

The *Miller* court explained that one does not commit a "direct act, however slight, toward consummation of the intended crime" so long as the person's conduct remains equivocal: "It is that quality of being equivocal that must be lacking before the act becomes one which may be said to be a commencement of the commission of the crime, or an overt act, or before any fragment of the crime itself has been committed." (*Miller*, *supra*, 2 Cal.2d at p. 531.) Applying this rule, the court reversed the defendant's conviction for attempted murder, explaining that "up to the moment the gun was taken from the defendant no one could say with certainty whether the defendant had come into the field to carry out his threat to kill Jeans or merely to demand his arrest by the constable." (*Id.* at p. 532.)

Here, the defendants' actions with respect to the houses were at least as equivocal as the defendant's actions in *Miller*. Before deciding upon any house to burgle, defendants drove slowly through residential streets, stopping for a minute or two in front of several houses, looking for the right one; when they identified a potential target, Bashir got out of the car to scout the house by knocking on the door and looking into the side yard; when she returned, the defendants remained in the car outside each house for several minutes apparently considering whether to break into that house or to continue their search. They rejected each house, not because something interfered with the execution of a burglary, but because, after considering each of the houses, they themselves decided to look for another target. Thus, defendants' scouting or casing did not constitute an unequivocal commitment to breaking in to the houses: They might break into the house, but they might keep looking. In fact, defendants did not break into any of these houses and instead kept looking until they found what they considered a

3

suitable target. After Bashir cased that house, she sat in the driver's seat as the getaway driver. Weddington and Nunnery exited the car, approached the house, and broke in through a window. Thus, their particular *modus operandi* shows that, at the earliest, the defendants unequivocally selected their target when the two men exited the car and walked onto the property of the house they actually burgled.

I agree with the majority that our review requires that we consider the totality of the evidence presented, including the reasonable inferences drawn from the evidence, in the light most favorable to the judgment. I also agree with the principle cited by the majority that we " ' " 'should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.' " ' [Citation.]" (Maj. opn. *ante*, at p. 12.) Here, common sense and the totality of the evidence point to one reasonable interpretation: Although defendants intended to break into one or more residences in the San Fernando Valley, they never decided to break into the Gothic Avenue, Gerald Avenue, and Tupper Street houses, and, therefore, never moved beyond mere preparation as to those homes.

Further, the cases upon which the majority rely are distinguishable. In *People v. Prince* (2007) 40 Cal.4th 1179, the defendant, who had previously entered several women's homes to attack his victims, had been stalking Patricia Van. Van's neighbor saw defendant looking into backyards in the area. The defendant knocked on Van's door and, when Van answered, asked for a person who did not live there. (*Id.* at pp. 1202, 1257.) At that point, the observant neighbor approached defendant from behind and "challenged him brusquely." (*Id.* at p. 1202.) The defendant then left. The Supreme Court held that these facts were sufficient to constitute attempted burglary because the defendant's acts "went beyond mere preparation *but were frustrated by the vigilance of the victim's neighbor*." (*Id.* at p. 1257, italics added.) Here, by contrast, no neighbor or other intervening force frustrated or interrupted the defendants' plans; they simply moved on to scout other houses.

4

In *People v. Superior Court* (2007) 41 Cal.4th 1 (*Decker*), the defendant entered into a contract with a man who agreed to kill the defendant's sister. The defendant gave the man a down payment of $5,000, and "had effectively done all that he needed to do to ensure that" the sister would be killed. (*Id.* at p. 14.) The hired killer, however, was an undercover detective. "But for" that fact, the court explained, "it [was] likely that [the defendant's] conduct would have resulted in the murder" of his sister. (*Id.* at p. 13.)

Here, by contrast with *Prince* and *Decker*, the evidence does not show that the defendants had done all they needed to do to ensure a burglary would be executed. Nor was it the absence of an outside force that prevented a burglary of the houses. Rather, it was the defendants' own decision to keep looking for a target that prevented the burglaries.

In *People v. Zaun* (March 25, 2016, C078962) ___ Cal.App.4th ___ [2016 Cal.App. Lexis 225] (*Zaun*), four associates employed "[t]heir normal approach" to committing burglaries: One of them would knock on the door of a residence and, if no one answered, they would "force the door open and steal what they could." (*Id.* at *1].) When they tried this approach on two particular houses, a resident answered the door. The person who knocked asked if a certain person lived there or engaged in some conversation, then left. A jury convicted the defendant of attempted burglary of both homes and the Court of Appeal affirmed. According to the Third District Court of Appeal, the jury could reasonably conclude that the "defendant and his associates had the specific intent to commit burglary in each case, and the appearance of the [residents] at their respective doors served to interrupt the intended crimes." (*Id.* at *5-*6].) Here, unlike in *Zaun*, there is no evidence that the defendants' intent to burgle was frustrated by the presence of unwanted occupants. Nor is there evidence that they would have consummated the crimes but for the presence of occupants in the houses. Rather,

knocking and looking around was only part of their preparation, as demonstrated by their decision not to burgle the houses and to keep looking for another target.[2]

The majority relies on the rule that " ' "slight acts in furtherance of the design will constitute an attempt." ' [Citations.]" (Maj. opn. *ante*, at p. 12.) The "slight acts" rule, however, "still presupposes some direct act or movement in execution of the design, as distinguished from mere preparation." (*Miller*, *supra*, 2 Cal.2d at p. 531.) That is, the "slight" act must occur *after* equivocation has ceased and consummation of the crime has commenced. (*Ibid.*) Because the defendants had engaged only in scouting or casing activities preparatory to a burglary, no act, slight or otherwise, had occurred beyond mere preparation until after they selected the Labrador residence for their crime. I would therefore reverse the convictions for attempted burglary on counts 9, 10 and 11.

II.     *Duty to Instruct on Lesser Included Offense of Misdemeanor Evading*

Under Vehicle Code section 2800.1,[3] "[a]ny person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor." If the driver of the car also drives "in a willful or wanton disregard for the safety of persons or property," the driver has violated section 2800.2, which can be punished as a felony.[4] (See *People v. Springfield* (1993) 13 Cal.App.4th 1674, 1679-1680 [the "only distinction between the

---

[2] The evidence regarding the September 7, 2011, incident at Elizabeth Barba's residence is a closer case. There, after Bashir knocked on the door and returned to the car, defendants drove to an alleyway behind the house. Weddington then got out of the car and appeared to be approaching the back of the house when he saw a police officer, and then changed directions and returned to the car. This situation fits more closely to the facts in *People v. Vizcarra* (1980) 110 Cal.App.3d 858, and *Zaun*, *supra*, ___ Cal.App.4th ___ [2016 Cal.App. Lexis 225]. Therefore, I would affirm the attempted burglary conviction on count 2.

[3] Unless otherwise indicated, all subsequent statutory references are to the Vehicle Code.

[4] A violation of section 2800.2 is a so-called wobbler because it can be punished as a misdemeanor or a felony. (*People v. Statum* (2002) 28 Cal.4th 682, 685.)

6

two crimes is that in committing the greater offense the defendant drives the pursued vehicle 'in a willful or wanton disregard for the safety of persons or property.' "].)

The court instructed the jury as to the charge of violating section 2800.2 without also instructing the jury that it could find defendant guilty of the lesser offense of violating section 2800.1. I believe this was prejudicial error.

As the majority states, a trial court has a duty to instruct the jury sua sponte " ' "on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " (Maj. opn. *ante*, at p. 21, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) The lesser offense instruction must be given when substantial evidence could support a finding that the defendant is guilty of the lesser offense. (*Id*. at p. 162.)

It is undisputed that Bashir, the driver of the getaway car, drove the car with willful and wanton disregard for the safety of persons or property. Weddington and Nunnery, however, did not drive the car at all—they were passengers. As the majority states, they can nevertheless be liable for violating section 2800.2 if Bashir's reckless driving was a natural and probable consequence of either their aiding and abetting of the burglary or their conspiracy to commit the burglary.[5] (See *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People v. Prettyman* (1996) 14 Cal.4th 248, 261.) As the majority concludes, " ' "the ultimate factual question [under the natural and probable consequences doctrine] is one of foreseeability." . . .' [Citations.]" (Maj. opn. *ante*, at p. 19.) Foreseeability in this context is based on an objective standard; that is, " ' " 'whether a reasonable person in the defendant's position would have or should

---

[5] It is also possible that Weddington and Nunnery could be liable as *direct* aiders and abettors of Bashir's criminal driving regardless of the natural and probable consequences doctrine. If, for example, they actively encouraged or directed Bashir to drive with willful and wanton disregard for the safety of persons or property, they would be liable for the greater crime even if it was not a natural and probable consequence of the burglary. There is, however, no evidence of such encouragement or direction.

7

have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*People v. Smith* (2014) 60 Cal.4th 603, 611.)

I agree with the majority that it was reasonably foreseeable to one in Weddington's and Nunnery's positions that Bashir, as the driver of the getaway car, would flee from and attempt to evade police officers following their burglary. I also agree that there was sufficient evidence from which the jurors could conclude that it was reasonably foreseeable that Bashir would do so with willful and wanton disregard for persons and property. I thus concur in the majority's substantial evidence analysis and the result in part III of the majority opinion.

In determining whether to instruct on the lesser offense of misdemeanor evading, however, the issue is not whether substantial evidence supports the verdict on the greater offense, but whether substantial evidence also supports the lesser offense: That is, that it was reasonably foreseeable that Bashir would flee from and attempt to evade police officers, but not with wanton and willful disregard for persons and property. I believe substantial evidence for that conclusion is found in the record. The greater crime involves greater risk to the occupants of the getaway car (as well as to persons in their path), increased punishment, and little chance of success. Thus, reckless driving from the scene of the crime was not inevitable. Indeed, the facts are susceptible of either crime and the jury should have been permitted to determine which, if any, crime the passengers committed.

The majority points out that Weddington and Nunnery "took full advantage of Bashir's reckless driving" as they threw items out of the car's windows and ultimately fled on foot after the car crashed. (Maj. opn. *ante*, at p. 22.) The majority also states that Nunnery's disregard for safety of person or property is evidenced by his battery on the apprehending officer. (*Ibid.*) These facts, however, shed no light on the question of whether, from an objective point of view, persons in the defendants' positions as participants in a burglary would reasonably foresee Bashir's reckless driving.

8

Because the evidence was sufficient to support a conclusion that misdemeanor evading, and not felony evading, was a foreseeable consequence of the defendants' burglary, the court erred in failing to instruct the jury with the lesser offense. Further, because it is a close question whether a natural and probable consequence of the burglary was the greater or lesser crime, the error was prejudicial. (See *Breverman*, *supra*, 19 Cal.4th at p. 149.) I would therefore reverse Weddington's and Nunnery's convictions for felony evading.

ROTHSCHILD, P. J.

9