Filed 2/24/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GUILLERMO VASQUEZ et al.,<br><br>    Defendants and Appellants. | F078228<br><br>(Kern Super. Ct. No. BF167343A)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

It is ordered that the opinion filed herein on February 9, 2022, be modified in the following particulars:

1.  On page 10, the first sentence in footnote 9, is modified to read:  "The Attorney General concedes that AB 333's amendments to section 186.22 apply retroactively to defendants."

There is no change in the judgment.  Respondent's petition for rehearing is denied.

POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DE SANTOS, J.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. GUILLERMO VASQUEZ et al., Defendants and Appellants. | F078228 (Kern Super. Ct. No. BF167343A) **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman II, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Guillermo Vasquez, Defendant and Appellant.

Benjamin Owens, under appointment by the Court of Appeal, for Nicky Diaz Carrillo, Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III., IV., and V. of the Discussion.

In an information filed January 16, 2018, the Kern County District Attorney charged defendants Guillermo Vasquez and Nicky Diaz Carrillo with first degree murder (count 1; Pen. Code, §§ 187, subd. (a), 189, subd. (a))[1] and assault with a firearm (count 2; § 245, subd. (a)(2).)[2] As to both defendants, the information also alleged that a principal discharged a firearm during the commission of the murder, proximately causing death to a nonaccomplice (§ 12022.53, subds. (d) & (e)(1).) The information further alleged both defendants were active gang participants who carried out the murder to further the activities of the criminal street gang. (§ 190.2, subd. (a)(22).) The information also alleged that both defendants committed both offenses "for the benefit of, at the direction of, or in association with Sure[ñ]os, a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Finally, the information alleged three enhancements under section 667.5, subdivision (b) against Vasquez, asserting he had committed a felony offense within five years of being released from a prison term. (§ 667.5, subd. (b).)

Trial was trifurcated into the following proceedings: trial of the murder charge and personal firearm use enhancement (§ 12022.53, subd. (d)); trial of the gang enhancements under sections 186.22[3] and the use of a firearm by a principal enhancement (§ 12022.53, subds. (d) & (e)); and trial of Vasquez's three prison priors. In the first proceeding, a jury convicted defendants of first degree murder and found the personal firearm use enhancement to be true as to both defendants.[4] In the second

_____

[1] All further statutory references are to the Penal Code unless otherwise stated.
[2] Count 2 was later dismissed at the prosecutor's request.
[3] Initially, this portion of trial was to also resolve the allegation under section 190.2, but that allegation was later dismissed at the prosecutor's request.
[4] At the court's prompting, the parties stipulated that the court would "dismiss" and strike the jury's "finding" that both defendants *personally* discharged a firearm causing death. The stipulation was based on an agreement that there was not substantial evidence that *each* of the defendants personally discharged a firearm causing death. However, the court still sentenced defendants on the use of a firearm by a principal enhancement. (See § 12022.53, subd. (e)(1).)

proceeding, the jury found true the gang enhancement (§ 186.22, subd. (b)(1)) and the discharge of a firearm by a principal causing death enhancement (§ 12022.53, subds. (d) & (e)(1)) as to both defendants. Finally, in the third proceeding, the court found true the prior prison term allegations against Vasquez.

The court sentenced Vasquez to 25 years to life in prison, plus 25 years to life (§ 12022.53, subds. (d) & (e)(1)), plus three years (§ 667.5, subd. (b).) The court sentenced Carrillo to 25 years to life, plus 25 years to life (§ 12022.53, subds. (d) & (e)(1)).

Both defendants appealed. In a prior opinion filed July 27, 2021, this court modified the judgment as to defendant Vasquez to strike the three one-year prison term enhancements imposed under former section 667.5, subdivision (b), and otherwise affirmed the judgment as to both defendants. The Supreme Court granted review, vacated our opinion, and transferred the matter back to us for reconsideration in light of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699) (AB 333.)

**FACTS**

## I. Phase One of Trial

The Residence Motel in Bakersfield is a known hot spot for criminal activity. It is bounded by Eureka Avenue to the north; Truxtun Avenue to the south; and Union Avenue to the west.

Motel surveillance footage showed Francisco Amavisca wandering around the motel premises through the early evening of February 18, 2017. The footage also shows defendant Carrillo going to various locations on the premises of the Residence Motel that day. At one point, Carrillo knocked on the door of room 245.

The prosecution's theory was that defendants shot Amavisca on the motel grounds at 7:14 p.m. About 16 minutes prior to the shooting, defendant Vasquez arrived at the

3

motel. At 7:14 p.m.,[5] surveillance footage shows Vasquez walking out of the main gate. The jersey he was wearing was pulled up over his head. Following closely behind was Carrillo, wearing a mask. The two made their way along the exterior of the motel, first heading north (near Union Ave), then east (near Eureka Street).

At 7:14:58, they leave the field of view of a surveillance camera in the direction of a stairwell on the north side of the motel. A second or two later, Amavisca came running into view of the camera from defendants' location. Amavisca ran down Union Avenue before collapsing. Amavisca bled to death from a gunshot wound that perforated his femoral artery. Various bystanders reported hearing four to five gunshots.

Defendants went up the stairs and headed towards room 245. They crouched below a partial wall as they approached the room. They entered room 245 shortly after 7:15 p.m.

Police arrived at the room about 16 minutes later. Carrillo was in room 245 along with a woman and a child. On the bed was a gray sweatshirt and blue jeans, identical to what Carrillo was wearing in the surveillance videos. Underneath a sofa cushion was a black ski mask. DNA from the sweatshirt and mask matched Carrillo.

Vasquez was not in room 245 when police arrived. From the time defendants entered room 245 until police arrived, surveillance cameras showed that no one left through the front door of the room. However, from the back windows of room 245, it is possible to step onto a flat roof nearby. Police officers exited room 245 via a back window onto the flat roof and found a black grocery bag with six spent rounds of .357-caliber ammunition.

Hours later, officers entered room 200. The door was ajar, but no one was inside. Inside the room, police found a disconnected security camera that resembled the security cameras on the motel premises. Inside the room's air conditioning unit, officers found a

---

[5] According to the surveillance video's timestamp.

4

.357-caliber revolver. The firearm was capable of being loaded with seven bullets. There was a single live bullet in the revolver when it was found by police.

Officers also found a Pittsburgh Steelers jersey on the bed and a drawstring backpack on the floor. The drawstring backpack had .357-caliber ammunition inside and a mask. They also found a Visa card with the name Yvette Garcia.[6]

Vasquez's DNA matched DNA on the revolver, the jersey, and the mask found in the drawstring backpack.

Police located Vasquez the next day at a residence on East 3rd Street in Bakersfield. Yvette Garcia was also at the residence. Inside a bedroom, officers located the key to room 200 of the Residence Motel. Officers also located a bag of .357-caliber ammunition at the home.

Officers interrogated Carrillo on the evening of February 18. Carrillo identified himself in still shots from the surveillance video of the Residence Motel. Carrillo said he had been watching the baby in the motel room when he heard gun shots. Carrillo claimed he had nothing to do with the shooting.

After hearing this evidence, the jury returned guilty verdicts on count 1, and true findings as to premeditation/deliberation (§ 189), and the personal firearm use resulting in great bodily injury or death enhancement (§ 12022.53, subd. (d)) as to both defendants.

## II. Phase Two of Trial

After the verdicts from the first phase were recorded, the second phase of the trial began. This phase pertained to the gang enhancement (§ 186.22, subd. (b)(1)) and the use of a firearm by a principal enhancement (§ 12022.53, subds. (d) & (e)(1).)

### A. *Prosecution Gang Expert – Officer Barajas*

Officer Barajas testified as the prosecution's gang expert. Barajas testified about several topics, including gang structure and hierarchy. Barajas explained that the

---

[6] Years prior, Vasquez was pulled over by police. Yvette Garcia was his passenger.

5

Mexican Mafia was originally a prison gang. The Mexican Mafia "spills out into the streets … through the Sure[ñ]os." The Mexican Mafia has created a gang structure, using Sureños as their "foot soldiers." At the top is a group of Mexican Mafia members referred to as the "Mesa" or "the table." They have monthly meetings, usually on the 13th of every month. This group then puts out "orders" that go down to the Sureños. The local, Kern County Sureño gangs also have monthly meetings.

The Mexican Mafia also "taxes" the Sureños. For example, if a member of a Sureño subset is given the ability to sell drugs in a particular area, he must pay "taxes" that eventually go to members of the Mexican Mafia.

In Bakersfield, the Sureño gang has several "subsets." A subset is a "smaller kind of clique" under the "umbrella" of the Sureños. Sureño subsets in Bakersfield include the Varrio Bakers, Colonia Bakers, West Side Bakers, East Side Bakers, South Side Bakers, Okie Bakers, Loma Bakers, and Uptown Bakers. Members of different subsets commit crimes together. Occasionally, subsets will have feuds with one another.

All Sureño gangs are associated with the Mexican Mafia. Sureño gang members pay homage to Mexican Mafia by getting tattoos associated with the number 13.[7]

The "big gang rival" of the Sureños are the Norteños. Generally, everything south of Delano is Sureño territory; and everything north of Delano is Norteño territory. The Residence Motel is in Sureño territory. It is a "melting pot" for various Sureño subsets.

Navy blue is the Sureño gang's color. The primary color of the West Side Bakers subset is turquoise.

**B.** *Predicate Offenses*

Officer Barajas testified that an individual named Jimmy Ramirez was involved in a court case arising out of an incident that occurred on December 6, 2014. Barajas

---

[7] "M" is the thirteenth letter of the alphabet.

6

opined that Ramirez is, and was, an active Sureño gang member and also belonged to the West Side Bakers subset.

An individual named George Mendoza was involved in a court case arising out of an incident that occurred on May 23, 2012. Officer Barajas opined that Mendoza is a member of the Sureño criminal street gang.

Officer Barajas also opined that Vasquez was an active member of the Sureños on February 18, 2017.

### C. *Primary Activities*

The primary activities of the Sureños are narcotics sales, prostitutions, homicide, murder for hire, robberies, burglaries, and "the list goes on."

### D. *Gang Evidence Concerning Defendant Vasquez*

#### 1. Prior Contacts with Law Enforcement

Officer Harless testified that he went to Vasquez's residence on October 9, 2010, as part of his police duties. A picture was found, under a mattress, depicting Vasquez holding a firearm. Another individual in the photo was wearing a hat with the letters "VB" on the front, and a third individual was holding his hands in the shape of a "V." Officer Barajas testified that the "V" hand symbol stood for "Varrio Bakers."

Officer Jones testified that he conducted a vehicle stop on April 14, 2013. Vasquez was driving the vehicle. Yvette Garcia was in the passenger seat. Underneath the driver's seat was a .22-caliber revolver.

#### 2. Vasquez's Tattoos

Vasquez has a tattoo on the top of his back that says, "Varrio" which is Spanish for neighborhood. Vasquez also has a tattoo that says, "BKS," which stands for "Bakers." Vasquez has another tattoo that says, "Lil Lokos" which is a smaller clique within the Varrio Bakers. This is a common tattoo on Sureño gang members. Above his left eye, Vasquez has a tattoo that reads, "VBKS" which stands for "Varrio Bakers."

7

There exists a picture showing Vasquez also had the three-dot tattoo, which is a "commonality across all Sure[ñ]os."

Officer Barajas testified that you would never see a nongang member with tattoos like Vasquez's.

### 3. Gang Evidence Concerning Defendant Carrillo

Officer Harless testified that on October 29, 2011, he stopped a vehicle in which Carrillo was riding as a passenger. Both Carrillo and the driver were wearing baseball caps with the letter, "W." Carrillo told Harless he was a member of the West Side Bakers.

Sergeant Wood testified that on May 12, 2011, he contacted Carrillo and informed him of his *Miranda*[8] rights. Carrillo was wearing a baseball cap with the letter, "W." Carrillo initially said he wore the hat because he liked the design. Carrillo later admitted that the "W" on the hat stood for West Side Bakers.

Officer Harless again contacted Carrillo on January 31, 2012. Carrillo was wearing a turquoise shirt and a baseball cap with the letter, "W." Carrillo again mentioned that he was a member of the West Side Bakers.

Officer Benavente testified that he contacted Carrillo on September 3, 2015. Benavente observed that Carrillo had the letters, "WSB," on his right cheek. Carrillo said the acronym stood for West Side Bakers.

### 4. Carrillo's Tattoos

Carrillo has tattoos reading, "KC," "VB," "WS," "V," and "S." "KC" stands for Kern County; "WS" stands for West Side; "V" stands for Varrio; "S" stands for South or "Sur." Carrillo also has a tattoo of three dots and a tattoo of a large "V" with the letters "arrio" inside. When "you put it together, you have Varrio."

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

Based on Officer Barajas's experience and training, Carrillo's tattoos are consistent with membership in the Sureño gang.

Officer Barajas testified that while he was taking pictures of his tattoos, Carrillo asked, "You guys take pictures of nongang ones too[?]"

### 5. Gang Membership

Officer Barajas testified that, in his opinion, Carrillo was a member of the Sureño gang on February 18, 2017. Officer Barajas's opinion was based on prior police contacts, gang apparel, self-admissions, and tattoos.

Officer Barajas also opined that Vasquez was an active member of the Sureños on February 18, 2017. That opinion was based on the surveillance video, tattoos, prior contacts, and prior weapons possession.

The prosecutor presented Officer Barajas with a hypothetical that matched the prosecution's theory of what the evidence showed. Barajas opined that such a crime would have been committed for the benefit of, at the direction of, and in association with a street gang. Since there were two Sureño gang members involved, the nonshooter can confirm to other Sureño gang members that the shooter had in fact followed through. The location also benefits the gang because it demonstrates that gang members are not afraid to shoot in a public place. Finally, it demonstrates that the shooter was willing to kill for the gang.

The "in association" prong is also satisfied because the two gang members were "together" when they committed the crime.

### E. *Defense Gang Expert – Dr. Jesse De La Cruz*

Dr. Jesse De La Cruz testified as a gang expert for the defense. Dr. De La Cruz has a doctoral degree in education and is a former member of the Nuestra Familia prison gang.

When gang members from Southern California go to prison, they are "automatically under the umbrella of the Mexican Mafia." "Same thing with Norteños or

Northerners," who automatically "become under the umbrella of the Nuestra Familia." Whatever "street gang" you belonged to "is no longer applicable."

Dr. De La Cruz opined that Officer Barajas's opinion expressed at the preliminary hearing was not connected to the evidence in this case. In determining whether a crime was done for the benefit of, in association with, or at the direction of a gang, Dr. De La Cruz looks at several factors. Dr. De La Cruz considers whether the participants "throw or yell out any gang slogans;" use gang signs; wear clothing associated with gangs; send text messages relating to the gang; or make gang-related posts on social media. Dr. De La Cruz testified that he did not find any of these factors present in the current case. However, Dr. De La Cruz conceded the factors are not required under the law.

Dr. De La Cruz testified it is possible for gang members to commit crimes that are not gang related. Dr. De La Cruz testified that he himself had committed several crimes, some related to the gang and others unrelated.

Dr. De La Cruz testified that a person may be a member of a Sureño subset without being a Sureño. Alternatively, a person can be in a subset and the Sureño gang itself.

## DISCUSSION

**I. Retroactive Application of AB 333 Requires Vacating the Gang and Firearm Enhancements**

Effective January 1, 2022,[9] AB 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 343.) Specifically, AB 333 narrows the definition of " ' "criminal street gang" ' " to " 'an[y] *ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the

---

[9] The Attorney General concedes that AB 333 applies retroactively to defendants. We accept the concession. (See *People v. Lopez* (2021) 73 Cal.App.5th 327 (*Lopez*).)

commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity.' [Citation.]" (*Lopez*, at p. 344.)

AB 333 also "redefines 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' [Citation.]" (*Lopez*, *supra*, 73 Cal.App.5th at p. 345.) "In addition, the currently charged offense cannot be used as a predicate offense under the amendments" made by AB 333. (*Ibid*.)

Unsurprisingly, the proof offered at trial does not satisfy the brand new requirements of AB 333. While there was evidence of predicate offenses offered at trial, the evidence did not establish that they "commonly benefited a criminal street gang, and the common benefit of the offense [was] more than reputational." (§ 186.22, subd. (e)(1).) Moreover, the Attorney General concedes that the evidence defendants specifically intended to promote, further, or assist in criminal conduct by gang members did not include any evidence showing that the common benefit to the gang " 'was more than reputational' " as now required by AB 333."[10]

"We therefore conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22." (*People v.*

---

[10] In his supplemental brief on remand, Carrillo argues one of the predicate offenses also failed to satisfy the pre-AB 333 statutory requirements in effect at the time of trial. We disregard this contention because supplemental briefs on remand from the Supreme Court "must be limited to matters arising after the previous Court of Appeal decision in the cause…." (Cal. Rules of Court, rule 8.200(b)(2).)

*Lopez, supra*, 73 Cal.App.5th at p. 346.) Here, the imposition of both the section 186.22, subdivision (b)(1) and section 12022.53 enhancements were based on gang-related enhancements findings. (See § 12022.53, subd. (e)(1)(A).) Therefore, we will vacate both enhancements, but they may be retried on remand. (See *People v. Sek* (Feb. 1, 2022, B309003) ___ Cal.App.5th ___ [2022 Cal.App. LEXIS 82].)

We still must address defendants' claims of error under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*) and insufficient evidence to support the gang-related enhancements. If either claim has merit, then the gang enhancements may not be retried under double jeopardy principles. However, in the following sections, we conclude both contentions lack merit. Therefore, we will remand pursuant to AB 333 "to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22." (*People v. Lopez, supra*, 73 Cal.App.5th at p. 346.)

## II. Prosecution was not Required to Show Connection Between Sureño Subsets

### A. *Introduction*

Carrillo argues the gang enhancement was not supported by substantial evidence under *Prunty, supra*, 62 Cal.4th 59.[11] Specifically, he argues that "because the government's theory was that the gang appellants benefitted for purposes of the enhancement was the broader Sure[ñ]os gang, under *Prunty*, it had to show a connection between the local subsets and the Sure[ñ]os." Carrillo contends the prosecution failed to show this requisite connection.

As we will explain, Carrillo's legal premise is flawed. The prosecution did not have to show a connection between the subsets and the broader Sureño gang, so long as it otherwise showed that the group defendant acted in association with, "the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Prunty, supra*, 62 Cal.4th at p. 81.) Because the prosecution showed that the *broader* Sureño gang satisfied all three, it need not show a connection

---

[11] Vasquez joins in Carrillo's argument.

between subsets.  (See, e.g., *People v. Pettie* (2017) 16 Cal.App.5th 23, 49–50.)  We reject defendants' challenge.

### B.    *Law*

In a gang prosecution under the Street Terrorism Enforcement and Protection Act, also known as the STEP Act (§ 186.20 et seq.), the prosecution must prove the purported gang is an "ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated] criminal acts…, having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subd. (f).)

To prove the gang enhancement under section 186.22, subdivision (b)(1), the prosecution must next show the defendant harbored the requisite intent and that the underlying crime was "committed 'for the benefit of, at the direction of, or in association with' " the criminal street gang.  (§ 186.22, subd. (b)(1).)

### C.    *The Sameness Requirement*

The definition of a "gang" in subdivision (f) and the elements of the gang enhancement in subdivision (b)(1) converge in an obvious, but important way.  "[T]he prosecution must show that the group the defendant acted to benefit,[12] the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same."  (*Prunty*, *supra*, 62 Cal.4th at p. 81; see also *id.* at p. 75.)  This is referred to as the " 'sameness' requirement."  (*Id.* at pp. 76, 81.)

Satisfying this requirement is often straightforward because "many gang-related prosecutions involve the conduct of discrete criminal street gangs and do not turn on the relationship between alleged gang subsets.  [Citations.]"  (*Prunty*, *supra*, 62 Cal.4th at p. 80.)

---

**12** "… []or which directed or associated with the defendant in connection with the crime[]."  (*Prunty*, *supra*, 62 Cal.4th at pp. 80–81.)

13

However, a different circumstance is presented when "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets …." (*Prunty*, *supra*, 62 Cal.4th at pp. 67–68.)  In that situation, "it must prove a connection between the gang and the subsets." (*Id*. at p. 68.)  This "connection" evidence is necessary to satisfy the sameness requirement because it shows "the groups in fact constitute the same 'criminal street gang.' " (*Id*. at p. 79.)

But there is no need to show that various gangs or subsets should be treated as one group, when there is a single group that, *itself*, satisfies all aspects of the sameness requirement.  (See *People v. Pettie, supra*, 16 Cal.App.5th at pp. 49–50; see also *Prunty*, *supra*, 62 Cal.4th at p. 80.)

**D.**     *Gang Organization*

Some gangs have associational or even hierarchal relationships to other groups or gangs.  For example, experts testified in the present case that the Mexican Mafia prison gang issues orders and imposes "taxes" on the Sureño gang.  The Sureño gang is itself an "umbrella" gang over several cliques or subset gangs.

Similarly, the rival prison gang, Nuestra Familia is an umbrella gang over the Norteños.

**E.**     *Gang Membership*

However, while some subset gangs fall under the organizational umbrella of a larger gang, not every member of the subset gang is necessarily a member of the larger, umbrella gang.  Indeed, an individual's gang membership may take one of several forms.  The individual may (1) only be a member of a subset; (2) only be a member of an umbrella gang; or (3) be a member of both a subset and an umbrella gang.  For example, Dr. De La Cruz was a member of the Nuestra Familia prison gang, but not a member of the Norteño street gang.  The predicate offenders in *Prunty* were members of a subset

14

gang but not the umbrella gang[13] (*Prunty*, *supra*, 62 Cal.4th at pp. 82–83), while Prunty himself belonged to *both* the subset gang and the broader umbrella gang (*ibid*. [Prunty belonged to subset and umbrella gang, in contrast to predicate offenders who only belonged to subset]).

The problem that arose in *Prunty* was that the defendant belonged to the umbrella Norteño gang, but the predicate offenders belonged only to subset gangs. (See *Prunty*, *supra*, 62 Cal.4th at pp. 82–83.) This discrepancy raised questions about the sameness requirement, because "the group the defendant acted to benefit" and "the group that committed the predicate offenses" must be "one and the same."[14] (*Id*. at p. 81.)

However, this problem does not arise when the defendant seeks to benefit, associates with, or acts under the direction of a particular gang, *and the predicate offenders are members of the same gang*. In that circumstance, the sameness requirement is satisfied tautologically. Thus, when a defendant commits a crime to benefit an umbrella gang, and the umbrella gang in question satisfies the primary activities and predicate offense requirements, it is not necessary to establish any connection between subsets of the umbrella gang. (*People v. Pettie*, *supra*, 16 Cal.App.5th at pp. 49–50.)

Similarly, as *Prunty* itself explains, "when a defendant commits a crime to benefit a particular subset, and the prosecution can show that *the subset in question* satisfies the primary activities and predicate offense requirements, *there will be no need to link together the activities of various alleged cliques*; nor is there likely to be uncertainty about what the relevant 'criminal street gang' is. Indeed, [Supreme Court] cases suggest that many gang-related prosecutions involve the conduct of discrete criminal street gangs

---

[13] Similarly, Dr. De La Cruz testified that not all members of subsets "partake in the actual Sure[ñ]o umbrella unless they choose to."

[14] The prosecution could have prevailed nonetheless if it had shown that the various groups were so organizationally connected that they were realistically a single gang. (See *Prunty*, *supra*, 62 Cal.4th at pp. 79–80.)

and do not turn on the relationship between alleged gang subsets. [Citations.]" (*Prunty*, *supra*, 62 Cal.4th at p. 80, italics added.)

Thus, it is clear there are multiple ways to satisfy the sameness requirement, depending on the circumstances of the case. First, the prosecution can establish that the defendant sought to benefit an umbrella or subset gang, and members of the *same* umbrella or subset gang also committed the requisite predicate offenses/primary activities. (See *People v. Pettie*, *supra*, 16 Cal.App.5th at pp. 49–50; see also *People v. Ewing* (2016) 244 Cal.App.4th 359, 372–373.) Alternatively, the prosecution can introduce evidence the defendant sought to benefit an umbrella gang, plus evidence that *another* gang/subset committed the predicate offenses/primary activities, plus evidence showing a sufficient associational connection between the umbrella gang and the other gang/subset. (*Prunty*, *supra*, 62 Cal.4th at p. 82.) The sameness requirement is satisfied by *either* approach. Meaning, if the prosecution does the former, it need not do the latter. In other words, the associational evidence described in *Prunty* is not required in every case where there is evidence a subset exists. (See, e.g., *People v. Pettie*, *supra*, 16 Cal.App.5th at pp. 49–50; see also *People v. Ewing*, *supra*, 244 Cal.App.4th at p. 372–373.)

### F. *Application*

Here, there is no violation of the sameness requirement because there was substantial evidence that the gang whose members Carrillo acted in association with, the gang whose members committed the predicate offenses,[15] and the gang whose primary activities were established by expert testimony is one and the same: the broader Sureño gang.[16]

---

[15] However, as noted in part I of the Discussion, *ante*, the predicate offense evidence is now defective for other reasons under AB 333.

[16] Carrillo very may well have been acting to benefit his specific subset as well. But since the sameness requirement was satisfied through the Sureño gang, it is immaterial that defendants may *also* have sought to benefit their respective subsets as well.

Carrillo points out that there was evidence he and Vasquez were members of different Sureño subsets.  Indeed, if this was the only evidence of their gang membership, the prosecution likely would have needed to produce the associational evidence described in *Prunty*.  However, the evidence also showed that, in addition to his membership in a subset, Carrillo was also a member of the umbrella Sureño gang.

Nothing in the gang statute required more. The prosecution proved the Sureños was a "criminal street gang" (§ 186.22, subd. (f))[17], and that defendants committed a felony "for the benefit of, at the direction of, or in association with" (§ 186.22, subd. (b)(1)) that same gang (i.e., the Sureños).

Carrillo argues there was no evidence he was a Sureño.  However, there was clear evidence Carrillo was a Sureño:  Officer Barajas's expert opinion that Carrillo was a Sureño.

Carrillo goes on to suggests Officer Barajas's opinion that he was a Sureño lacked foundational evidentiary support.  We disagree.  Carrillo had several gang-related tattoos.  While some were associated with the West Side Bakers subset, others were associated with the broader Sureño gang.  Carrillo had a tattoo of three dots, which is a tattoo associated with the Sureño gang.  Carrillo also had a tattoo with the letters, "KC," which is also associated with the Sureño gang.  Finally, Carrillo had a tattoo of the letter "S," which stood for "South" or "Sur."

### III.    Substantial Evidence Supported the Gang Findings[*]

Vasquez initially argued there is insufficient evidence to support the gang findings necessary for the enhancements under section 186.22, subdivision (b) and 12022.53, subdivision (e)(1).  While we are vacating the gang findings under AB 333, we still must address this claim to determine whether the enhancements may be retried on remand.  As

---

[17] Under the definition of criminal street gang in effect at the time of trial.

[*] See footnote, *ante*, page 1.

17

explained below, we conclude the gang findings were supported by substantial evidence under the law in effect at the time of defendants' trial.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)

"There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1). [Citation.] The first prong requires that the prosecution prove the underlying felony was 'gang related.' [Citations.] The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' [Citations.]" (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484, fn. omitted (*Weddington*).)

### A.    *First Prong – Gang-relatedness*

"Section 186.22, subdivision (b)(1) provides three alternatives for establishing the first prong – that the underlying offense was 'gang related.' The offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; *or* (3) in association with a gang. [Citation.] Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member. [Citations.] The first prong therefore may be established with substantial

18

evidence that two or more gang members committed the crime together, unless there is evidence that they were 'on a frolic and detour unrelated to the gang.' [Citations.]" (*Weddington*, *supra*, 246 Cal.App.4th at p. 484.)

Here, there was clearly evidence that two or more gang members committed the crime together. Officer Barajas opined that Vasquez and Carrillo are both gang members. Surveillance video showed Vasquez and Carrillo, shortly before the shooting, walking towards the eventual murder scene near each other, while obscuring their appearance (i.e., Carrillo was wearing a mask; Vasquez pulled his jersey up around his head). Surveillance video also showed Vasquez and Carrillo quickly making their way to the same motel room after the shooting. Because there is substantial evidence that two or more gang members committed the crime together, and the crime was not shown to be a frolic and detour, the first prong is satisfied. (See *Weddington*, *supra*, 246 Cal.App.4th at p. 484.)

It is true that some factors that generally tend to show a crime was committed for the benefit of a gang were not present here, such as gang slogans, signs or clothing. Similarly, Vasquez argues the crime was in a dark area of the hotel, which was located in "relatively neutral [gang] territory."[18] Indeed, these factors are relevant to ascertaining whether the crime was committed *for the benefit* of a gang. However, they do not undermine the evidence that the crime was committed by two gang members working *in association*. And since *either* is sufficient to show gang-relatedness, "a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with … another gang member. [Citations.]" (*Weddington*, *supra*, 246 Cal.App.4th at p. 484.)[19]

---

[18] While Officer Barajas described the area as a "melting pot" – he meant a "melting pot" of Sureño subsets. He clearly testified the motel was in Sureño territory.

[19] The present case is distinguishable from *People v. Perez* (2017) 18 Cal.App.5th 598, because the defendant in that case was not acting in association with other gang members. (See *id*. at p. 613 [no evidence defendant's companions were gang members, or that they were present for/assisted with the shooting].)

19

**B.** *Second Prong – Specific Intent*

The fact that Carrillo and Vasquez – two gang members – came together to commit a crime also satisfies the second prong that the defendant have the specific intent to " 'promote, further or assist in any criminal conduct by gang members.' [Citations.]" (See *Weddington*, *supra*, 246 Cal.App.4th at p. 485.) "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 68.)

Here, there is evidence the defendants intended to and did commit the charged felony (i.e., murder) with known members of a gang (i.e., each other). As a result, the jury was free to infer each defendant specifically intended to promote, further or assist the criminal conduct of a gang member (i.e., the other defendant).

**IV. Because We Remand for Resentencing for Other Reasons, Vasquez's Claim of Error Regarding Ability to Pay is Moot**\*

In his opening brief, Vasquez argued the court violated his due process by imposing restitution in an amount to be determined, a $300 restitution fine (§ 1202.4, subd. (b)), a $40 court operations fee (§ 1465.8) and a $30 criminal conviction assessment fee (Gov. Code, § 70373) without any finding he had the ability to pay. Because we are remanding for proceedings that will result in resentencing at one point or another, this contention is now moot.

---

Because there was sufficient evidence, under the law in effect at the time of trial, the crime was committed in "association" with other gang members, we need not address whether there was also sufficient evidence the crime was committed for the benefit of or at the direction of a gang.

\* See footnote, *ante*, page 1.

20

**V.    We Accept the Attorney General's Concession that Vasquez is Entitled to Relief Under Senate Bill No. 136**\*

In supplemental briefing, Vasquez argues he is entitled to retroactive relief under Senate Bill No. 136.  (2019–2020 Reg. Sess.)  The Attorney General agrees that Vasquez is entitled to the benefits of this legislation.

Because Vasquez's prior prison terms were not imposed for sexually violent offenses, the one-year prison term enhancements can no longer be applied to him under Senate Bill No. 136.  (See *People v. Gastelum* (2020) 45 Cal.App.5th 757, 772.)  Therefore, we accept the Attorney General's concession.

## DISPOSITION

The following enhancements are stricken as to defendant Guillermo Vasquez: the three, one-year prison term enhancements imposed under former section 667.5, subdivision (b); the firearm enhancement under section 12022.53; and the gang enhancement under section 186.22.  The prosecution may elect to retry the firearm and/or gang enhancement.

The following enhancements are stricken as to defendant Nicky Carrillo: the firearm enhancement under section 12022.53; and the gang enhancement under section 186.22.  The prosecution may elect to retry the firearm and/or gang enhancement.

In any event, defendants shall be resentenced.  In all other respects, the judgments are affirmed.


                                                                        POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DESANTOS, J.

---

\* See footnote, *ante*, page 1.