Filed 9/16/25  P. v. Deflaun CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> STEPHEN ARTHUR DEFLAUN, <br><br> Defendant and Appellant. | 2d Crim. No. B330427 <br> (Super. Ct. No. F000314004001) <br> (San Luis Obispo County) |

Stephen Arthur Deflaun appeals the judgment entered after a jury convicted him on two counts of first-degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a)) and assault with a firearm upon a peace officer (§ 245, subd. (a)).  The jury also found true a multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)) as well as allegations as to the murder counts that appellant personally and intentionally discharged a firearm

_____

[1]All further statutory references are to the Penal Code.

causing death (§ 12022.53, subd. (d)) and personally used a firearm in committing the assault upon a peace officer (*id.*, subd. (b)).  In a bifurcated proceeding, the trial court found appellant had failed to meet his burden of showing by a preponderance of the evidence that he was legally insane at the time of the killings.[2]  The court sentenced him to an aggregate term of life without the possibility of parole (LWOP) plus 66 years to life. Appellant contends his trial attorney provided ineffective assistance of counsel (IAC) at sentencing.  We affirm.

*Facts*

On July 8, 2001, appellant drove his van to the campground at Morro Strand State Beach.  Appellant had lived in the van since 1986 and had been previously diagnosed with paranoid schizophrenia and alcohol use disorder.  Since 1979, he had not sought treatment or taken antipsychotic medication because he was "afraid that they would have [him] committed and murdered."

Appellant checked in at the campground kiosk with park aide Heidi Houdek and was assigned to a campsite.  Appellant

---

[2] Appellant's crimes were committed in July 2001.  In February 2002, criminal proceedings were suspended after appellant was declared incompetent to stand trial.  In 2021, he was returned to criminal court after the public guardian filed a certification of his mental competency.  In February 2022, the court found appellant competent to stand trial and the criminal proceedings were reinstated.

drove to the campsite, then drove to a nearby grocery store and bought a 12-pack of beer.

After appellant had returned to his campsite, Stephen Wells and his wife Elizabeth arrived at the campground in a recreational vehicle (RV) along with Elizabeth's 11-year-old nephew Jerry, her 11-year-old son Brian, and her two other children. Houdek told Wells to drive around the campground to see if he could find a campsite large enough to accommodate the RV. After entering the campground, Wells parked next to appellant's van and told Brian and Jerry to ask appellant if he was staying the night.

Jerry asked appellant through his van window if he would be moving and appellant answered no. After Jerry told Wells what he had asked and how appellant had responded, Wells told him to ask appellant more specifically if he was staying the night. When Jerry asked this question, appellant yelled something like "'[g]et out of here. I'll kick your ass.'" Wells got out of the RV and asked appellant "'why are you yelling at my kids?'" Wells and appellant yelled at each other. Wells told appellant that he smelled marijuana and alcohol and was going to report him.

Wells drove the RV to the exit side of the kiosk and parked. Wells then walked to the entrance side of the kiosk with Jerry and Brian and asked Houdek to call the park ranger. After reaching the dispatcher, Houdek handed the phone to Wells. Wells told the dispatcher that appellant had threatened his nephew and was drunk and smelled of marijuana.

Appellant approached the exit side of the kiosk and began arguing with Wells through the kiosk windows. Brian heard appellant yell "'[y]ou shouldn't have fucked with me,'" then saw him pull out a gun and start shooting. Brian saw Jerry fall to the

3

ground after being shot in the head, then ran and hid behind a car.

Elizabeth heard two gunshots, saw Wells lying on the ground near the kiosk, and called 911. Appellant opened the living room door to the RV, pointed a gun at the children inside, and asked Elizabeth if she had a gun. Elizabeth replied "[n]o" and pleaded that she had two small kids. Appellant yelled, "'[w]hy'd you have to fuck with me'" and slammed the door closed.

Houdek heard the gunshots and got down on the floor of the kiosk. After about a minute she crawled to the back door and exited the kiosk to head toward her car. She saw appellant with a gun and showed her hands. Appellant told Houdek he was not going to hurt her and calmly "said something to the effect of it was over." Houdek got into her car and drove away as Park Ranger Charles Jackson, a sworn peace officer, was arriving in his patrol car. Houdek stopped and told Jackson that two people had been killed.

As Jackson was driving toward the kiosk he saw two people lying on the ground near the entry side. Jackson stopped his vehicle and saw appellant near the exit side of the kiosk pacing, talking, and waving a gun. Jackson exited his vehicle with a 12-gauge shotgun, identified himself as state park peace officer, and ordered appellant to drop his weapon. Appellant pointed his gun at Jackson's face. Jackson attempted to fire his shotgun at appellant but there was no round in the chamber. He ran and took cover behind the RV.

Jackson pointed his shotgun at appellant and again ordered him to drop his weapon. Appellant once again pointed his gun at Jackson. Jackson fired his shotgun at appellant, who took cover behind another vehicle. Jackson eventually fired his

4

shotgun underneath the vehicle behind which appellant had taken cover and appellant was struck by multiple pellets. Appellant threw his gun backward over his head and was taken into custody and transported to the hospital for treatment of his injuries.

A sample of appellant's blood taken at the hospital contained a blood alcohol level of 0.12 percent. A forensic toxicologist opined that appellant had a blood alcohol level of 0.15 to 0.17 percent at the time of the shootings.

Jerry had two gunshot wounds to his head and was pronounced dead at the scene. Wells had gunshot wounds to the side of his head, below his right eye, in his right bicep, and above his left knee. Wells was transported to the hospital and died in the emergency room.

Appellant testified in his own defense. On the day of the shootings, he was hearing voices and quickly drank 12 beers to calm himself. When Wells approached appellant's van to confront him about his treatment of Brian, appellant "gave him the finger[.]" Wells yelled at appellant and told him to get out of the van if he wanted to fight. Appellant "might have been a little nervous" but Wells "didn't really scare [him]."

Appellant claimed that about 10 minutes after Wells left in the RV, appellant heard voices telling him that Wells was a "fed agent assassin sent by the programmers to murder [him]." Appellant exited the van with his loaded .357 caliber revolver because he wanted to protect himself and "give Wells an excuse to shoot [him]." As appellant walked from his van to the kiosk, he decided to "die by fed agent assassin" to avoid "being captured and tortured at some future time by the program."

After arguing with Wells from the exit side of the kiosk, appellant walked around the kiosk and shot Wells in the head. Wells fell to the ground and when he tried to get up, appellant shot him two more times.  Appellant claimed he shot Wells because he had seen Wells reaching toward his right-hand pocket and was "scared."  According to appellant, he "changed [his] mind about dying at the last minute."  After shooting Wells, appellant saw a "quick movement to [his] left" in his peripheral vision and then turned and shot Jerry.  Appellant subsequently walked over to Jerry, who was lying on the ground, and shot him again. Appellant then walked over to Wells, who was also lying on the ground, a shot him again as well.  In shooting both victims in this manner, appellant "let [his] arm hang down" and "looked straight ahead and pulled the trigger."

When appellant encountered Jackson, he did not fire his gun at him because he "didn't know whether he was with Stephen Wells, the assassin, or whether he was actually a park ranger."  He claimed that he wanted Jackson to shoot him, but then "gave up on him shooting [him]" and decided to take cover behind a nearby vehicle.  When Jackson ordered appellant to drop his weapon, appellant responded "'[n]o fucking way'" because he still "didn't know whether he was an assassin . . . or whether he was a real park ranger."

Appellant also presented the testimony of two mental health experts.  Dr. Carolyn Murphy, a forensic psychologist, diagnosed appellant with paranoid schizophrenia and opined that the disorder prevented him from appreciating the quality of his actions or understanding moral or legal right from wrong.  Dr. Kevin Perry opined that appellant was able to understand the nature and qualify of his actions, but at the time of the offenses

6

was unable to understand right from wrong due to his mental illness. On rebuttal, two prosecution mental health experts opined that although appellant was suffering from schizophrenia when the crimes were committed, he was capable of understanding the nature and quality of his actions and distinguishing right from wrong.

*Sentencing*

In anticipation of sentencing, appellant's trial attorney filed a statement in mitigation asserting among other things that the court should dismiss all three firearm enhancements pursuant to sections 1385 and 12022.53, subdivision (h). Counsel argued that "the court should not impose the firearm enhancements because it would cause the court to impose an unjust sentence. An indeterminate life sentence, without the possibility of parole, is more than sufficient punishment for a man who has demonstrable severe mental health disorders." Counsel also identified mitigating factors including (1) that appellant was suffering from a mental condition that significantly reduced his culpability for the crimes, and (2) that multiple enhancements were alleged in the case. (Cal. Rules of Court, rules 4.423(b)(2) & 4.423(b)(11).) Counsel further asserted that "[i]f the court, in its discretion, does not impose both of the 25-life firearm enhancements under [section] 12022.53(d), then the court could impose the ten (10) year enhancement under [section] 12022.53(b)."

Prior to sentencing appellant, the trial court stated "I'm well aware of the significant mental health issues that [appellant] suffers from and has suffered from for a long-standing period of time." In subsequently imposing a sentence of 25 years to life on count 1 for the first-degree murder of Wells, the court

7

exercised its discretion to dismiss the 25-year firearm enhancement attendant to that count "pursuant to [section] 12022.53 subsection (h) and . . . section 1385[.]"  On count 2 (the first degree murder of Jerry), the court imposed a consecutive sentence of LWOP plus a consecutive 25-year firearm enhancement pursuant to section 12022.53, subdivision (d).  On count 3 (the assault of Jackson), the court imposed a consecutive midterm sentence of six years plus a consecutive 10-year firearm enhancement pursuant to section 12022.53, subdivision (b).

*Discussion*

Appellant contends his trial attorney provided ineffective assistance of counsel (IAC) at sentencing by failing to argue for dismissal of the firearm enhancements pursuant to section 1385, subdivision (c)(2), and by failing to request imposition of the low term on count 3 pursuant to section 1170, subdivision (b)(6)(A). We are not persuaded.

To establish his IAC claims, appellant must demonstrate that trial counsel's alleged failures fell below an objective standard of reasonableness and that absent those errors there is a reasonable probability appellant would have achieved a more favorable result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694.)  We may reject the claim "without determining whether counsel's performance was deficient" if appellant fails to demonstrate prejudice.  (*People v. Kipp* (1998) 18 Cal.4th 349, 366.)  Appellant fails to satisfy this high burden.  (*People v. Williams* (1988) 44 Cal.3d 883, 937 [prejudice must be proved as a "'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel"].)

Under section 12022.53, subdivision (h), "[t]he court may, in the interest of justice pursuant to [s]ection 1385 and at the

8

time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." Section 1385, subdivision (c)(1) states: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so . . . ." Subdivision (c)(2) of section 1385 instructs that in determining whether an enhancement should be dismissed in furtherance of justice, "the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

As relevant here, subdivision (c)(2) of section 1385 requires the court to consider and give great weight to evidence that multiple enhancements are alleged in a single case (*id.*, subd. (c)(2)(B)), as well as evidence that the defendant's crimes are connected to mental illness (*id.*, subd. (c)(2)(D)). The statute, however, "does not 'presume' an enhancement should be dismissed whenever an enumerated mitigating circumstance is present, but instead 'the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement' and this 'furtherance of justice' inquiry requires a trial court's ongoing exercise of 'discretion[.]' Thus, notwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of

9

justice" inquiry.'" (*People v. Walker* (2024) 16 Cal.5th 1024, 1033 (*Walker*), citations omitted.) "[I]f the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' [Citation.]" (*Id.* at p. 1036.)

In reviewing appellant's claims, we must presume the trial court was aware of, understood, and followed the law. (*People v. Weddington* (2016) 246 Cal.App.4th 468, 492.) Appellant fails to overcome the presumption here that the trial court properly applied section 1385, subdivision (c) in deciding whether to dismiss the firearm enhancements. Trial counsel's statement in mitigation cited sections 1385 and 12022.53, subdivision (h), and urged the court "not [to] impose the firearm enhancements because it would cause the court to impose an unjust sentence. An indeterminate life sentence, without the possibility of parole, is more than sufficient punishment for man who has demonstrable severe mental health disorders." (Fn. Omitted.) Moreover, the court actually dismissed the firearm enhancement on count 2 pursuant to section 1385. Although counsel did not specifically cite subdivision (c) of section 1385, he referred the court to the two applicable mitigating factors that are stated in that subdivision, i.e., that appellant's offenses were connected to

mental illness and that multiple enhancements were alleged in the case.   (Cal. Rules of Court, rules 4.423(b)(2), 4.423(b)(11); compare § 1385, subds. (c)(2)(B) & (c)(2)(D).)  We must presume that the court was aware of section 1385, subdivision (c)—which had been in effect for over 18 months at the time of sentencing— and properly applied that law in both dismissing the the firearm enhancement on count 2, and in declining to dismiss the enhancements on counts 1 and 3.

Appellant offers no support for his assertion that the presumptions of regularity and correctness do not apply to his IAC claims.  Merely pointing out that counsel did not expressly refer to subdivision (c) of section 1385, and that the court did not refer to that subdivision at sentencing or explain its reasons for declining to dismiss the enhancements on counts 1 and 3 pursuant to that law, does not lead to a conclusion that the court failed to consider and apply that law.  Section 1385 requires a court to state its reasons for *dismissing* an enhancement (*id.*, subd. (a)), but the statute contains no similar requirement for when a court decides *not* to dismiss (see *id.*, subdivision (c)). (See *People v. Roach* (2016) 247 Cal.App.4th 178, 184 [“‘An intention to legislate by implication is not to be presumed. [Citation.]  In construing a statute, we do not insert words into it as this would “violate the cardinal rule that courts may not add provisions to a statute”’”]; *Yoo v. Shewry* (2010) 186 Cal.App.4th 131, 146 [“‘“‘[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded’”’”]; see also *In re Coley* (2012) 55 Cal.4th 524, 1278.)  Although the court in *Walker* noted that a statement of reasons for declining to dismiss an enhancement “serves the[] same interests” as a statement of reasons for a dismissal (*Walker,*

11

*supra*, 16 Cal.5th at p. 158, fn. 6), the court did not hold that such a statement is compelled.

Moreover, appellant does not contend the trial court abused its discretion in declining to dismiss the firearm enhancements on counts 1 and 3; rather, he merely asserts that trial counsel provided IAC by "failing to understand the law and to adequately advocate for a sentencing disposition that was most favorable to him." He does not dispute that the evidence overwhelmingly supports the court's findings that the violent, vicious, and callous nature of appellant's crimes—which included the brutal and senseless execution of an 11-year-old child—and his serious danger to society were aggravating factors for purposes of sentencing. (Cal. Rules of Court, rules 4.421(a)(1) & (b)(1).) Nor does he dispute that the court could reasonably find these factors "'neutralize[d] even the great weight of the mitigating circumstance[s], such that dismissal of the enhancement[s on counts 1 and 3 was] not in furtherance of justice.'" (*Walker, supra*, 16 Cal.5th at p. 1036.) Because appellant does not overcome the presumption that the court was aware of, understood, and applied subdivision (c) of section 1385 in deciding whether to dismiss the firearm enhancements on counts 1 and 3, his claim that trial counsel provided IAC by failing to refer to that subdivision fails for lack of prejudice.

Appellant fares no better in claiming that his trial attorney provided IAC by failing to argue for imposition of the low term on count 3. Section 1170, subdivision (b)(6)(A), which also went into effect on January 1, 2022, provides in relevant part that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order

12

imposition of the lower term" if the defendant "has experienced psychological . . . trauma" that "was a contributing factor in the commission of the offense."  As appellant notes, a defendant with a mental disorder is entitled to the benefit of this subdivision if the disorder has resulted in psychological trauma that contributed to the crime.  (*People v. Banner* (2022) 77 Cal.App.5th 226, 241.)

As with section 1385, subdivision (c), we must presume the court was aware of section 1170, subdivision (b)(6)(A) when it sentenced appellant on count 3.  Moreover, the court declined to exercise its discretion to dismiss the 10-year firearm enhancement on count 3 notwithstanding its reliance on appellant's mental illness as a mitigating factor.  Because it is not reasonably probable that trial counsel's express reference to section 1170, subdivision (b)(6)(A) would have led the court to impose the low term on count 3, appellant's claim that counsel provided IAC by failing to argue for the low term also fails.

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P. J.


CODY, J.


13

Jacquelyn Duffy, Judge
Superior Court County of San Luis Obispo
_____

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.